2021 IL App (2d) 200552
No. 2-20-0552
Opinion filed March 3, 2021

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF DMITRY LEVITES, | ) ) ) | Appeal from the Circuit Court of Lake County. |
|     Petitioner and Counterrespondent-Appellee, | ) ) ) ) | |
| and | ) ) | No. 17-D-747 |
| NURIANA LEVITES, | ) ) ) | Honorable |
|     Respondent and Counterpetitioner-Appellant. | ) ) ) | Charles W. Smith, Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court, with opinion.
Justices Jorgensen and Schostok concurred in the judgment and opinion.

**OPINION**

¶ 1    After her previous appeal (*In re Marriage of Levites*, No. 2-20-0254 (2020) (*Levites I*) (unpublished summary order under Illinois Supreme Court Rule 23(c))) was dismissed for want of jurisdiction, respondent and counterpetitioner, Nuriana Levites, again appeals the order of the circuit court of Lake County denying her amended petition for relocation, seeking to relocate with her child from her marriage to petitioner and counterrespondent, Dimitry Levites. In this appeal, respondent argues that the trial court erred in assigning her the burden of proving by a preponderance of the evidence that relocation was in S.L.'s best interests and that the trial court's

judgment denying her amended petition for relocation was against the manifest weight of the evidence. We affirm.

¶ 2                                      I. BACKGROUND

¶ 3     We summarize the relevant facts appearing in the record on appeal. Respondent is 34 years of age and currently resides in Chicago. Petitioner is 49 years old and currently resides in Highland Park. Respondent was born and educated in Russia, and she previously lived in Moscow with her family. Petitioner is a United States citizen and, for at least the past 21 years, has owned and operated a business making dental prosthetics and implants.

¶ 4     In March 2013, respondent lived in Moscow and vacationed in Jamaica, where she met petitioner, who lived in Illinois and was also vacationing in Jamaica. Respondent testified that petitioner aggressively courted her, calling her many times a day and flying her to Illinois. On August 20, 2014, the parties were married. During the marriage, a child, S.L., was born to the parties. On April 26, 2017, petitioner filed a petition for dissolution of marriage.

¶ 5     As respondent later learned, petitioner had three previous marriages. In 1997, petitioner was first married, and, in 1998, the first marriage was dissolved; no children were born from that first marriage. In 1998, petitioner married for a second time, and, during the marriage, petitioner and his second wife had twins. In 2001, petitioner divorced his second wife; he does not appear to have regular contact with his children from that marriage. In 2003, petitioner married his third wife, with whom he had a son. In 2011, petitioner and his third wife divorced. Respondent testified that she remembered seeing his son only three times during her marriage to petitioner, even though a parenting schedule had been set. Finally, after petitioner's and respondent's divorce had been initiated, petitioner married his fifth wife, Anat, in a purely religious ceremony, which S.L.

attended. Later, still during the pendency of the dissolution proceedings here, petitioner divorced Anat in a purely religious ceremony.[1]

¶ 6    The parties' marriage was marred with allegations of abusive behavior. Respondent testified that petitioner was very controlling and isolating. Specifically, respondent testified that petitioner controlled the parties' finances and repeatedly confiscated respondent's credit cards. Respondent also testified that petitioner attempted to interrupt respondent's relationships with her parents and her sister and discouraged or prevented their visits and even telephone or video communications.

¶ 7    According to respondent, petitioner used illegal drugs, like cocaine, during the marriage. Petitioner denied that he used illegal drugs. Petitioner was tested once for illegal drug use, and the test found no illegal drugs. Even though respondent made additional allegations that petitioner was continuing to use illegal drugs, no further testing was ordered.

¶ 8    Respondent also testified that petitioner committed abusive acts during the marriage. Specifically, respondent testified that, sometime in the first half of 2015, when S.L. was about seven months old, petitioner took S.L. from her, physically pushed respondent from the house, and locked the doors, resulting in respondent crawling through a window to get back inside the house. Respondent further related that petitioner threatened to have her deported and would manufacture claims of abuse to prevent her from having custody of or seeing S.L. again.

----

[1] The marriage to Anat was never legally solemnized. Because there was no legal effect to the marriage, petitioner was not committing bigamy.

¶ 9 Continuing, respondent testified about a November 2015 incident. The incident began with petitioner speaking ill of respondent's family. He then dragged her throughout the house, choked her, and pushed her so that she fell down, apparently all while she held S.L. Respondent testified that she was in S.L.'s room screaming to the neighbors for help. Respondent testified that petitioner's behavior had her so scared that she ran, still holding S.L., out of the child's room and downstairs. There, petitioner pushed her, S.L. still in her arms, from the house. Respondent went to the house of Stella Picchietti, a neighbor, who generally corroborated respondent's testimony about a fight between petitioner and respondent. On the next day, respondent filed a report with the police. Respondent stayed with a friend for the next few days.

¶ 10 According to respondent, on April 17, 2017, shortly before petitioner filed his petition for dissolution of marriage, petitioner became aggressive after some illicit drug use and forbade respondent from communicating with anyone, even her parents. Respondent testified that she was going to record petitioner's ravings but petitioner grabbed her phone and submerged it in the sink and then struck respondent. Respondent called the police emergency number. She also obtained an emergency order of protection against petitioner.

¶ 11 Following this incident and the grant of the emergency order of protection, petitioner moved out of the marital residence and stayed with his friend, Uladimir Marozau. Under adverse direct examination, petitioner testified that he had been friends with Marozau for about 13 years at that point. Marozau helped him to find a divorce attorney, and, on April 26, 2017, petitioner filed his petition for dissolution of marriage. Petitioner agreed that he informed Marozau about the progress of the divorce from respondent and instructed his attorney to include Marozau in receiving all divorce-related correspondence.

¶ 12    On May 23, 2017, the trial court entered a mutual no-contact order, which precluded both parties from engaging in harassing conduct, committing physical abuse, interfering with the other's personal liberty, or stalking each other. The order also set a parenting schedule, with S.L.'s primary residence with respondent and petitioner having parenting time on two weekday evenings and one overnight on the weekend; custody exchange was ordered to occur at a neighbor's house.

¶ 13    The record shows that, during the latter part of May 2017, petitioner transferred substantial sums of money and goods to Marozau. He transferred approximately $27,000 in cash and 11 cars worth approximately $125,000. The cars were transferred to a business in which Marozau had an interest and was controlled by a friend of Marozau. The record does not indicate the relationship between petitioner and Marozau's friend. Petitioner explained that the transfer occurred to allow Marozau's business to sell the cars. These transactions appear to have been accomplished before May 29, 2017.

¶ 14    On May 26 and 27, 2017, petitioner exercised his overnight parenting time. During the afternoon of May 27, 2017, the parenting exchange occurred at the Highland Park police station. Petitioner was accompanied by Marozau. Petitioner, on adverse direct examination, testified that Marozau became aggressive during the exchange and told the police that he would shut down the police department and that he would kidnap S.L. Petitioner testified that, for his and S.L.'s safety, the police asked Marozau to leave. The police also told petitioner that he should consider Marozau's statement as a threat to be taken seriously, and they informed petitioner that they would contact the Department of Children and Family Services (Department) because of Marozau's statement.

¶ 15    On Memorial Day, May 29, 2017, at about 5:20 a.m., Marozau entered the marital residence and beat respondent, ultimately dragging her out of the house and down the driveway. Neighbors Howard and Barbara Dane had been awakened by their dog, and Howard observed Marozau make his entrance into the home; Barbara called the police. Howard went outside and confronted Dimitry Voronin, who was driving a car that had been parked outside the marital residence and who was apparently assisting in the offense. By the time Marozau had dragged respondent to the end of the driveway, police arrived and restrained and arrested Marozau and Voronin. Respondent testified that she had been severely beaten, she had bruises all over her body, and hair had been ripped from her head. Petitioner testified that, on the next court date, May 30, 2017, he did not observe any bruising on respondent; the court orders memorializing the May 30 hearing did not note that respondent demonstrated observable or obvious marks of violence.

¶ 16    Respondent filed an emergency petition seeking to suspend petitioner's visitation and to require supervised visitation once petitioner's parenting time resumed. Respondent also requested the appointment of a guardian *ad litem*. On May 30, 2017, the trial court ordered that both parties were precluded from having S.L. in Marozau's presence. In a separate order, Robert Lewinthal was appointed as S.L.'s guardian *ad litem*.

¶ 17    Regarding the May 29, 2017, incident, Marozau was charged with a number of offenses and bail was set at $1 million. On May 30, 2017, Marozau, with his attorney present, called petitioner from the jail. Petitioner recounted on adverse direct examination that Marozau had demanded $200,000 and had stated, "otherwise I will get some thoughts in my mind." Petitioner agreed to provide the $100,000 bail money and promised that they would talk after Marozau had been released on bond. Petitioner explained that he decided to post the bond money for Marozau,

not because he felt threatened by Marozau's statement, but because Marozau held nearly $125,000 of his property, namely, the cars he had transferred to Marozau's business to sell on his behalf. Petitioner testified, however, that he had no further contact with Marozau following the May 30 call from the jail.

¶ 18    In posting Marozau's bond, petitioner did not pay it directly in his own name. Instead, he obtained a cashier's check and gave it to Vladimir Pechenev, a friend, with the instruction to pay Marozau's bond. Petitioner explained that he used an intermediary to post the bond, because Marozau's attorney had advised him to proceed in that fashion.

¶ 19    Petitioner was interviewed by Lewinthal shortly after Marozau's attack on respondent. According to Lewinthal, petitioner minimized his relationship with Marozau, calling him an "acquaintance, not a friend." Lewinthal also testified that petitioner claimed that he had not spoken with Marozau since the attack. However, Lewinthal later learned that, the day after the attack, petitioner had spoken with Marozau and agreed to post bond. Further, while Lewinthal believed that Pechenev had posted Marozau's bond, petitioner eventually admitted to him that he had provided the money for the bail.

¶ 20    Unsurprisingly, petitioner and respondent had a poor relationship. During the pendency of this case, respondent reported a number of threats by petitioner. On November 16, 2017, a plenary order of protection was issued against petitioner, which covered only respondent and not S.L. At the hearing, respondent testified that petitioner would threaten her during the visitation exchanges and that, after each of three specific exchanges, she reported the threats to the police. Petitioner, for his part, denied making threats.

¶ 21    Respondent testified that, around the time when petitioner made the threats, S.L. would repeat what respondent believed to have been phrases petitioner taught her. Respondent testified that, specifically, S.L. would say, "Dad told me Mom was bad, Mom was bad," or would sing, "Mom is bitch, Mom is bitch, Mom is bad," like a "mantra" that S.L. would repeat "all the time."

¶ 22    Respondent testified that, in May 2018, S.L. began saying things about petitioner's private parts. Respondent filed a police report. The Department investigated the allegations of abuse and determined them to be unfounded.

¶ 23    Respondent also presented testimony from petitioner's neighbors from when petitioner was living in the marital residence without her. The neighbors testified that on several occasions they directly observed S.L. playing outside with no adults within their observation. On cross-examination, it was developed that the neighbors could not see into petitioner's house or garage when they made their observations. Petitioner denied that he let S.L. play outside unsupervised and testified that he or another adult was observing her when she was playing outside.

¶ 24    For his part, petitioner testified that, earlier in the pendency of this case, respondent frequently canceled his parenting time, claiming that S.L. was ill. Makeup time for the missed visits was generally ordered; petitioner acknowledged that he did not believe that he had missed any parenting time. Moreover, as the case progressed, it appears that petitioner consistently exercised his visitation.

¶ 25    On March 5, 2019, respondent filed her petition for relocation, seeking the court's approval to relocate with S.L. to either New York or California. On April 15, 2019, respondent filed her amended petition for relocation, seeking the court's approval to relocate to California. At the hearing, respondent testified that she was prompted to seek relocation by concern for her and S.L.'s

safety, although respondent admitted that she did not believe that petitioner would harm S.L. Respondent testified that she would live with her sister in Beverly Hills and that she had leads on three jobs, but she had no written offers or even any details to present. According to respondent, her primary employment lead was working for a law firm that catered to the Russian expatriate community in Los Angeles. However, throughout the proceedings, respondent requested an interpreter, maintaining that her English language skills were not up to the task of testifying and understanding the proceedings. Finally, respondent testified that the schools in the area in California had received high marks, according to websites she had visited. Lewinthal disputed that respondent had investigated the schools and had found them to be of adequate quality, and he testified and reported that respondent had not looked into them. In his report, Lewinthal noted that he had researched the elementary school that respondent planned for S.L. to attend and that it was a good school with above average scores.

¶ 26 On June 13, 2019, Dr. Frances Pacheco, a psychologist, filed her report advising the trial court on the allocation of parental responsibilities pursuant to the trial court's order. The court's June 27, 2018, order empowered Pacheco to interview the parties and S.L., to provide the court with input regarding S.L.'s best interests and the allocation of parental responsibilities. Pacheco recommended, pertinently, that respondent be allowed to relocate to California and that petitioner's visitation with S.L. in California be supervised. Pacheco remarked in her report that, when S.L. was with petitioner, his then-wife, Anat, was S.L.'s primary caretaker and that petitioner had commented to Pacheco that, if respondent were allocated anything other than supervised visitation with S.L., he would withdraw his contact with S.L. out of fear that respondent would continue to make allegations of abuse. Petitioner was questioned about this and denied that he

made the statement. Pacheco also remarked that she doubted that either parent "had the willingness and ability *** to encourage and facilitate a positive relationship between [S.L.] and the other parent."

¶ 27    On September 6, 2019, respondent filed her counterpetition for dissolution of marriage. In the counterpetition, respondent adopted Pacheco's recommendations, including requiring petitioner have only supervised visitation with S.L. in California. It should be noted, however, that, throughout the great majority of this case, petitioner enjoyed unsupervised visitation, including overnight visits, and had about half of the parenting time.

¶ 28    Lewinthal testified regarding his involvement with the case and the best interests of S.L. He "had no objections" to respondent's request to relocate, because petitioner had said during a personal interview that, if respondent received unsupervised parenting time, petitioner might withdraw his contact with S.L. Petitioner denied making the statement. On direct examination, he clarified the context of the remark, made to both Lewinthal and Pacheco. Petitioner explained that he feared that respondent would continue to make unfounded allegations of physical and sexual abuse and that S.L. would be psychologically torn up by the investigations. Petitioner explained that, to spare him and S.L. the pain of the allegations and investigations, he might feel compelled to withdraw from S.L. if respondent received unsupervised parenting time.

¶ 29    The matter proceeded to a hearing on respondent's counterpetition for dissolution of marriage and her amended petition for relocation. On March 3, 2020, following the hearing (which occurred over several days during November 2019 and January 2020), the trial court denied respondent's amended petition for relocation "without prejudice." Respondent appealed the ruling

on the amended petition for relocation and, in a summary order filed August 5, 2020, we dismissed the appeal for lack of jurisdiction.

¶ 30    Matters proceeded apace in the trial court. On August 11, 2020, respondent noticed up all outstanding matters for hearing, including the amended petition for relocation. On August 27, 2020, those matters were heard. During the August 27 hearing, the parties did not present any new evidence or any new arguments regarding the amended petition for relocation. The trial court orally denied the petition and explained that, because all pending matters had been resolved, namely the division of marital assets and the allocation of parental responsibilities, the orders were final, and it was denying respondent's request to include Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016) language. On August 27, the court entered the orders on parental allocation, a marital settlement agreement, and a no-contact order. On September 8, 2020, the court filed the written order denying the amended petition for relocation. The written order provided, pertinently:

"1. On the issue of Relocation of S.L. to the State of California, [respondent] did not present new or additional evidence and no further testimony was propounded by [respondent];

2. Based on the reasons stated on the Record on March 3, 2020[,] and based on no new evidence being brought before the court the Amended Petition for Relocation is hereby DENIED.

3. The Court's findings as contained in the March 3, 2020, ruling on the amended petition for relocation are incorporated herein as if set forth verbatim.

4. By separate orders, the financial matters and allocation of the marital assets/debts are resolved by agreement per the parties['] Marital Settlement Agreement and the issues

of parenting time and parenting responsibility are resolved per the Parental Allocation Judgment."

¶ 31 The trial court expressly incorporated its oral remarks from the March 3, 2020, hearing into the September 8, 2020 order. In those remarks, the court first defined the evidence it had considered: the evidence from the hearing, Pacheco's report, and Lewinthal's reports and testimony. Next the court defined the relevant legal rules it applied in its analysis: the statutory factors and the case law discussing the application of the factors. It noted that it was particularly sensitive to the issue of a custodial parent who is seeking relocation and has been interposing roadblocks, "however slight," in the relationship between the child and the noncustodial parent.

¶ 32 Next, the trial court discussed the facts it found to be "extremely disturbing." The first issue was Marozau's May 29, 2017, attack and attempted kidnapping of respondent. The court labeled as "important to the Court's ruling and to this case" the fact that petitioner provided the money to post Marozau's bond. Regarding petitioner's in-court testimony and statements to Lewinthal that "he knew nothing about the attack, that he was fearful of [Marozau], and [that] he virtually had no or limited knowledge of [Marozau]," the court found them to be "absolutely incredible." The court was also troubled that petitioner posted bond for Marozau "so that [Marozau] could be on the street and [respondent] could be terrorized by the action that this individual was still at large." While the court concluded that petitioner had approved of Marozau's attack on respondent, it expressly declined to find that petitioner had directed the attack to proceed or that petitioner knew in advance that the attack would occur. The court reasoned that, because petitioner's involvement had been investigated by the police, and the parties neither deposed Voronin, Marozau's accomplice, nor

called him to testify about petitioner's involvement, it could not conclude that petitioner's involvement was more than after-the-fact approval as evidenced by the posting of bond.

¶ 33    The trial court did not find just petitioner's testimony about Marozau's attack and attempted kidnapping to be unworthy of belief, it also "had huge credibility issues with a lot of the testimony of [respondent]." The court first noted its overarching determination that respondent had attempted to interfere with petitioner's relationship with S.L. It then honed in on respondent's allegations of sexual abuse against petitioner, noting that the Department had "investigated those complaints, police departments ha[d] investigated those complaints and found no basis for them whatsoever." The court highlighted an August 12, 2019, medical report in which S.L. was diagnosed with vaginal inflammation, but it noted that "there was no follow-up, there was no [Department] call, [and there was] nothing to support [respondent's] assertion that [petitioner] had molested the child."

¶ 34    Petitioner also did not escape unscathed from the trial court's review of each parent's interference with the other's relationship with S.L. The court noted that there was testimony that, when S.L. was returned to respondent after parenting time with petitioner, S.L. would sing or say that respondent was bad. The court determined petitioner's denial to be incredible.

¶ 35    The court chastised both parties for "attempt[ing] to use this child and attempt[ing] to use the court system and attempt[ing] to use the law enforcement authorities to garner an advantage in their case." The court then noted that, prompted by Marozau's attack, respondent filed her petition (and then amended petition) for relocation nearly two years after petitioner filed this dissolution action, which raised the heat in the already contentious divorce proceedings.

¶ 36    The trial court turned to its application of the legal rules to the facts, keeping in mind the troubling issues it had just explained. In the first half of this part of its comments, the court mentioned and distinguished the cases that respondent had provided. In the second half, the court made specific analyses of each of the statutory factors. We excerpt the relevant portions of the court's remarks.

¶ 37    In the case-law portion of its remarks, the trial court stated that "[t]he only basis that [it] could find to support [petitioner's] request [for relocation] is her physical safety." After distinguishing a case, the court stated:

"I do not in any way mean to minimize what happened here, but it is the only instance, that's one instance, it's a very serious instance, and thank goodness the neighbors were alerted because I don't know what [Marozau] would have done if he was successful in getting [respondent] to his car. I know that he had her out of the house, that she sustained injury, she was treated at the hospital, he just didn't get her in the car before the police thankfully arrived. That one instance weighs heavy on this court, but I cannot say that that alone is a basis for granting this petition. Rather, I'm concerned by the conduct of [respondent] that once I grant relocation to the state of California, she will seek to have the California authorities investigate her claims of sexual abuse of the child which I have already found lack credibility."

The court then noted that it was to consider any and all relevant evidence in reaching its decision and that the factors from *In re Marriage of Eckert*, 119 Ill. 2d 316 (1988), were not exclusive. No single factor controlled and weight should be given to each of the factors.

"One single factor that favors [relocation] is the violence. And if there were enough—if the petition and the evidence had shown that there were other good reasons to relocate to California, *i.e.*, schools, *i.e.*, economic opportunity, *i.e.*, that [respondent] was moving because somebody she had entered into a relationship with was relocating, those are cases where in many of those cases relocation ha[d] still been denied."

The court discussed *In re Marriage of Demaret*, 2012 IL App (1st) 111916, and *In re Parentage of P.D.*, 2017 IL App (2d) 170355, in which relocation was denied even though the mother would have garnered a huge salary increase if she had been allowed to relocate.

"In this case, I don't have that she even has a job. There was an allegation that she was going to be employed as a paralegal in a law firm. Throughout these proceedings now going on three years[,] [respondent] has at all contested hearings utilized a court interpreter, which suggests she has very limited use of the English language, so what job she was going to get—she never produced a job offer sheet, a letter from a potential employer, or anything that indicated how she was going to support herself and the child. She did testify that she had the assistance of her sister, but the sister never testified. There was testimony that there was a two-bedroom apartment that was available, which meant the child necessarily would be sharing *** a room in the apartment, a bedroom with her mother.

The type of planning and specificity that I see in cases where relocation has been allowed was totally lacking in this case. I'm not sure how [respondent] was going to be able to support herself and the child. I had no particulars on the school. The child is now of school age. And I also have, if you will, the advantage of looking at two years of a normal parenting schedule. Initially there were orders in this case that prohibited

[petitioner] from seeing the child. There was an order of protection sought that named the child as a protected party; that was later amended. But throughout a period of two years, there were no violations to the order of protection, [petitioner] committed no act of violence towards [respondent], and he is regularly seeing the child, he regularly has overnights with the child. Therefore[,] it was my conclusion that if I were to allow relocation, I would be essentially terminating [petitioner's] parental rights. The idea that [petitioner and respondent] could have some sort of cooperative relationship in traveling from one coast to Chicago is pure folly. Both parties have been guilty of doing everything to undermine the other that they possibly could. So the Court could not find that [respondent] would cooperate with seeing that the parent-child relationship would continue. And again, I was able to at least look at over the last two years the child has been with her father on a regular basis, has seen her father, and I would be putting the child in a situation where I don't know that she would ever see her father again.

I'm reviewing my notes as I speak, but I find that there was an incident where [respondent] was videotaping [petitioner] and trying to make a case he was violating the order of protection. She denied that and her own e-mails belied her testimony. In examining her during trial, I asked her specifically if she believed that [petitioner] would harm the child and she said no."

The trial court discussed *In re Marriage of Eaton*, 269 Ill. App. 3d 507 (1995), explaining that, in that case, the reviewing court

"noted that the case was made difficult by the good faith of the parties in regard to the petition for removal. I don't have anything close to that here. I have bad faith between these

parties and actions which indicate that they will not cooperate in fostering a good relationship.

And then another [passage] from that case [says] [a]ny removal will have some effect on visitation but the real question is whether the visitation schedule is both reasonable and realistic to create—there's no way we could do that in this case. [Respondent] has no economic ability to participate in the cost of travel of the child and has demonstrated no inclination to want to do that."

¶ 38 The trial court distinguished several other cases. In so doing, it made the determination that petitioner had a strong interest in seeing and maintaining his relationship with S.L. The court also noted that requesting relocation to be with a spouse or to continue a committed relationship is a weighty factor but that, here, respondent was not seeking to further such a relationship but was instead seeking to move away from petitioner. The court stated that the desire to move to another state, without more, was insufficient to show that the move would be in the best interests of S.L. However, the court acknowledged that respondent's desire to move in this case "is compelling only because of the serious physical threat to [respondent] presented by [Marozau]."

¶ 39 While the trial court maintained that its discussion of the case law's application of the factors governing relocation sufficiently covered the statutory factors, it nevertheless expressly analyzed the facts in light of the current statutory factors, presented in section 609.2 of the Illinois Marriage and Dissolution of Marriage Act (Act) (hereinafter sometimes referred to as the relocation statute) (750 ILCS 5/609.2 (West 2018)). As this is relevant to respondent's contentions, we excerpt the court's comments in full on this topic:

"I do want to review the relatively recent amendment to our statute of [section] 609.2 [of the Act] setting forth the factors that the Court must consider when ruling on a petition for relocation. One, that the circumstances and reasons for the intended relocation, she has good reason to be fearful of [petitioner], but that does not answer the question of what the effect is on the child. The fact that the parties for two years, almost three years, have carried on a normal visitation parenting time schedule is an indication that the burden has not been met. The reasons, if any, why the parent is objecting to the relocation, [petitioner] tells me he's objecting because he wants to be part of his daughter's life. Does he have about as much animus towards [respondent] as she does toward him? I would acknowledge that. At the same token, I do believe that he is sincerely interested in the child.

The third factor is the history and quality of each parent's relationship with the child, specifically whether a parent has substantially failed or refused to exercise parental responsibilities allocated to him or her in the parenting plan. In this case[,] we don't even have a parenting plan, which is kind of embarrassing considering the length of the litigation. But again, the factor of this criminal case [against Marozau] was part of the reason for the delay. I find that the history has been that he utilizes all of his parenting time. I have reviewed Exhibit 21 in the case, which was a series of e-mails where on many occasions [respondent] was not willing to change a pickup time, change a pickup location, in any way cooperate with [petitioner] in seeing that the child had time with her father.

The fourth factor is the educational opportunities for the child in the existing location and the proposed new location. I know very little from the report or from the testimony at trial concerning the schools that the child would be going to. There was a

generalization that the schools in Beverly Hills are very good and allegedly better than Chicago. I know that the child, based on [respondent's] current location, will be going to schools in the Lincoln Park area of Chicago. Those schools have a good reputation.

The fifth factor is the presence or absence of extended family at the existing location and the proposed location. The only factor here that weighs in favor of [respondent's] petition is the fact that her sister lives in Los Angeles. I have nothing about family in this area. There was testimony about [respondent's] mother visiting, but she is not a citizen. She comes here on a travel visa. And so there is no—it's very hard on [respondent], from the testimony I heard, she has no family support system here. But all she's going to have out in Los Angeles is one sister. I know that from the testimony that— from other [of petitioner's] relationships, marriages, there are [S.L.'s] cousins and siblings, half-siblings that are in this area.

The sixth factor is the anticipated impact on the relocation of the child. And frankly, there was no testimony, so nothing was presented in the way of evidence that the child would be negatively or positively impacted by this relocation.

Seven, whether the Court will be able to fashion a reasonable allocation of parental responsibility between the parents if relocation occurs. I find that far from meeting the burden on that, exactly the opposite is true. These parties will not cooperate with each other. The history of interference with parenting time is prolonged to the future and, again, I am very fearful that no matter what I might write in an order that this Court would retain jurisdiction, that [respondent] would seek a different view from the courts out in California.

Eight is the wishes of the child. Due to her tender years, nothing was put forth in this, and that's not unexpected.

Nine, possible arrangements for the exercise of parental responsibilities of the parental—appropriate for the parents' resources and circumstances. These parties do not have a lot of resources. Unfortunately what resources they have have been expended in three years of litigation with attorneys, [guardian *ad litem*] fees, and [evaluators pursuant to section 604.10(b) of the Act (750 ILCS 5/604.10(b) (West 2018))]. So there isn't a lot of money. And a child at the age of five cannot just be put on a plane. Somebody is going to have to take her or parenting time would have to take place in California. It will be expensive. So it would be very difficult to arrange that.

Ten is minimization of the impairment of the parent-child relationship by parent's relocation. As I have already stated, it is this Court's opinion that allowing the relocation will effectively terminate [petitioner's] involvement in the child's life. I'm not saying he couldn't overcome that, but from the evidence presented to me to date, I don't see any way that he would be—that [respondent] would foster [petitioner's] involvement in the child's life.

Any other relevant factors bearing on the child's best interests. I know it's argued that if [respondent] is happier, the child will be happier. The relocating part, the parent is happier. I can't make that generalization. I don't—while I received extensive, by volume, of paper reports from the [guardian *ad litem*], I don't have any feel for how this child would react to relocation, and I know that generally children like stability. And there has been a stable, long-term pattern of parenting time with both mom and dad overnights. And while

it's been rocky for most of the time, over the last year, really, I have not dealt with any motions concerning the parties' parenting time.

So I'm going to state for the record that the five *Eckert* case criteria are pretty subsumed into the statutory factors and the 2016 amendment to the statute.

So I think I have covered the reasons why I'm going to deny the motion for relocation. I'm denying it without prejudice. I remain very troubled by what went on here. I remain very concerned that [petitioner] was involved to some extent in the violence against his wife. If there is any violence towards her, I will not—I would have to reconsider my holding today that one act is not sufficient reason to allow the relocation of the child. I don't think it's in the child's best interests. It's in [respondent's] best interests, and it's in everybody's best interests that these parties have limited contact with each other. But at some point—and they both have taken the parenting class—at some point they are going to have to work cooperatively on an allocation judgment and division of parenting responsibilities.

So it is denied for now without prejudice. If something comes up, a better plan, the plan put forth in this case is simply not acceptable to this Court, did not in a legal sense meet the requirements of the *Eckert* case or of the statute to grant relocation."

¶ 40 On September 23, 2020, respondent filed her notice of appeal, within 30 days of the September 8, 2020, denial of her amended petition for relocation. On October 21, 2020, this court issued its mandate in *Levites I*.

¶ 41                                   II. ANALYSIS

¶ 42    As an initial matter, we note that petitioner has not filed a brief in this appeal. We will nevertheless consider the appeal under the principles of *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133 (1976) (allowing the consideration of the appeal on only the appellant's brief where the record is simple and the errors can be considered without the benefit of additional briefing).

¶ 43    On appeal, respondent argues that the trial court erred in discerning a burden of proof within section 609.2 of the Act and in assigning it to her. She also argues that the court's judgment was against the manifest weight of the evidence. Before turning to respondent's issues on appeal, we must first address a jurisdictional issue.

¶ 44                                    A. Jurisdiction

¶ 45    Respondent asserts that we have jurisdiction over this appeal, reasoning that the September 8, 2020, denial of her amended petition for relocation was a final order because the other pending issues had been resolved in the August 27, 2020, orders. This assertion is apparently belied by Illinois Supreme Court Rule 369(b) (eff. July 1, 1982), which provides that, "[w]hen the reviewing court dismisses the appeal or affirms the judgment and the mandate is filed in the circuit court, enforcement of the judgment may be had and other proceedings may be conducted as if no appeal had been taken."  Stated in the negative, "a trial court may not rule on a petition that is filed before the appellate court issues its mandate if the petition involves issues that were presented to the appellate court for review". *Longo v. Globe Auto Recycling, Inc.*, 318 Ill. App. 3d 1028, 1035 (2001). The proceedings on remand from *Levites I* would appear to fall squarely within that prohibition: on March 30, 2020, respondent filed her notice of appeal in *Levites I*. On August 5, 2020, we issued our summary order dismissing *Levites I* for lack of jurisdiction. On August 11,

2020, respondent noticed up all outstanding matters for hearing, including the amended petition for relocation. On August 27, 2020, the trial court orally indicated that it was denying the amended petition, and, on September 8, 2020, the trial court entered the written order denying the amended petition for relocation. On September 23, 2020, respondent filed her notice of appeal in this case and, on October 21, 2020, we issued the mandate in *Levites I*.

¶ 46    *Longo* initially appears to be on all fours with this case. In *Longo*, the defendants timely appealed the October 8, 1998, final orders and a November 4, 1998, order denying the defendants' motion for reconsideration. *Longo*, 318 Ill. App. 3d at 1034. On March 24, 1999, the appellate court dismissed the first appeal. *Id.* at 1035. On May 21, 1999, the trial court vacated the October 8 final orders. *Id.* at 1032. On August 11, 1999, the appellate court issued its mandate with respect to the first appeal. *Id.* at 1035. On August 18, 1999, the trial court denied the plaintiff's motion to vacate or to reconsider the May 21 order, and the plaintiff timely appealed. *Id.* The appellate court concluded that the trial court lacked jurisdiction over both the defendant's petition to vacate the May 21 order as well as the May 21 order itself. The appellate court reasoned that jurisdiction was lacking because the defendant had reinitiated proceedings in the trial court on the issue that had been appealed before the appellate mandate had issued and revested the trial court with jurisdiction. *Id.*

¶ 47    While the timing of the actions in *Longo* line up closely with the timing in this case, there is a significant distinction between the cases. In *Longo*, the first appeal was taken from final orders. Here, by contrast, the appeal in *Levites I* was taken from an unappealable nonfinal order. The difference in the inherent appealability of the order in the first *Longo* appeal and the nonfinal order in *Levites I* determines the outcome here.

¶ 48 Generally, the timely filing of a notice of appeal divests the trial court of jurisdiction and confers jurisdiction upon the appellate court. *Huber v. American Accounting Ass'n*, 2014 IL 117293, ¶ 8. However, "[t]he filing of a notice of appeal from an order or judgment which the supreme court rules do not make appealable neither deprives the trial court of jurisdiction to proceed with the case nor vests the appellate court with jurisdiction to consider it." *North Community Bank v. 17011 South Park Ave., LLC*, 2015 IL App (1st) 133672, ¶ 24. Thus, because the appeal in *Levites I* from the nonfinal order was not made appealable by the supreme court rules (such as Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016)), it was essentially a nullity and did not deprive the trial court of its jurisdiction to proceed, even on the very subject matter of the *Levites I* appeal. This also makes sense in the context of this case. If the appeal from an unappealable order were to divest the trial court of jurisdiction while the appellate court sorted it out, and only upon the issuance of the appellate mandate would jurisdiction be restored to the trial court, then a bad-faith litigant could file a notice of appeal on any order, halt the proceedings in the trial court until the appellate mandate, and repeat the process over and over so as to prolong the action in the trial court indefinitely and drain the resources of the other litigant or litigants.

¶ 49 This principle is also embodied in *Callen v. Akhter*, 66 Ill. App. 3d 421 (1978), which provides guidance here. In *Callen*, the defendant appealed from a judgment entered on remand following an interlocutory appeal that was dismissed for lack of jurisdiction. The appellate court held that the trial court had jurisdiction to enter the judgment on remand, although the mandate had not yet been issued, because (1) the prior appeal was a premature interlocutory appeal and, thus, the trial court never lost jurisdiction; and (2) the parties voluntarily participated in the matter on remand, thereby waiving any jurisdictional objection. *Id.* at 424. The fact that the appellate

court in *Callen* had dismissed the improper appeal for lack of jurisdiction before the trial court once again took up the issues was an important factor in the decision, as was the waiver of the problem presented by the lack of the mandate. Similarly here. *Levites I* was dismissed before respondent sought to have the ruling on the amended petition for relocation finalized, and both parties fully participated despite the lack of a mandate. Thus, under the reasoning of *Callen*, jumping the gun and resuming litigation on the same issue as presented in the abortive first appeal does not affect our jurisdiction over this appeal.

¶ 50    Finally, there is a very good reason to apply *North Community Bank* and the reasoning in *Callen* to the facts presented here. This case involves the custody of a child and is accelerated pursuant to Illinois Supreme Court Rule 311(a) (eff. July 1, 2018). Another dismissal on the arguable ground of lack of jurisdiction would frustrate the expediency with which we are to address these kinds of appeals. S.L., whose best interests are paramount, would continue to languish in uncertainty. While it would be different if respondent appealed again from a nonfinal order, in this appeal we are not clearly and unequivocally without jurisdiction, and there is sufficient authority supporting the invocation of our jurisdiction along with considerations of the nature of this matter. Accordingly, we conclude that we have jurisdiction over this appeal and now turn to respondent's substantive contentions.

¶ 51                                B. Burden of Proof

¶ 52    Respondent argues that the trial court erred in its application of section 609.2 of the Act. Respondent notes that, in 2016, the Act was amended and section 609 (750 ILCS 5/609 (West 2014)) (hereinafter sometimes "the removal statute") was repealed and replaced with section 609.2. Section 609 provided that the party seeking removal bore the burden of proving that removal

was in the child's best interests: "The burden of proving that such removal is in the best interests of such child or children is on the party seeking the removal." 750 ILCS 5/609(a) (West 2014); see also *Eckert*, 119 Ill. 2d at 324 (concluding that the party seeking removal bore the burden of proof under the removal statute (citing Ill. Rev. Stat. 1985, ch. 40, ¶ 609)). Respondent contends that section 609.2 does not include a burden of proof to establish whether relocation is in the best interests of the child. Respondent notes that the trial court relied on *In re Marriage of Kavchak*, 2018 IL App (2d) 170853, ¶ 65, in determining that "the burden of proof [was] on respondent" to demonstrate that relocation was in S.L.'s best interests. Respondent contends that *Kavchak*'s statement about the burden of proof in relocation cases is rooted in section 609 and that the repeal of section 609 and its replacement with section 609.2 deliberately omitted a burden of proof altogether in favor of a focus on the child's best interests. Respondent concludes that the improper assignment of the burden of proof is reversible error. See *In re Marriage of Riess*, 260 Ill. App. 3d 210, 216-17 (1994) (the statute then in effect expressly assigned the burden of proof to the movant; the trial court erred by assigning to the nonmoving party the burden of proof).

¶ 53 To evaluate respondent's argument, we must interpret section 609.2. The interpretation of a statute presents a question of law. *In re Marriage of Earlywine*, 2012 IL App (2d) 110730, ¶ 18. We review *de novo* questions of law. *Id.*

¶ 54 When embarking on statutory interpretation, we seek to ascertain and give effect to the legislature's intent. *Metropolitan Life Insurance Co. v. Hamer*, 2013 IL 114234, ¶ 18. The best indication of legislative intent is the language of the statute given its plain and ordinary meaning. *Id.* We may not depart from the language of the statute and read into the provision exceptions, limitations, or conditions. *Id.*

¶ 55 Respondent essentially contends that the trial court imported the burden-of-proof requirement from the removal statute, despite the fact that it does not appear in the relocation statute. Indeed, the burden-of-proof language is not present in the relocation statute. Instead, section 609.2 provides that the party wishing to relocate must provide notice to the other party, who then may or may not object to the proposed relocation. 750 ILCS 5/609.2(c)-(e) (West 2018). If there is no objection, then the relocation will go forward as proposed. *Id.* § 609.2(e). If there is an objection, then "the parent seeking relocation must file a petition seeking permission to relocate." *Id.* § 609.2(f).

¶ 56 Respondent proposes that the omission of the burden-of-proof language from section 609.2 means that the legislature intended to remove the burden-of-proof from the statute so that there would be no burden of proof in relocation proceedings. Instead, according to respondent, the relocation statute now focuses solely on the child's best interests. *Id.* § 609.2(g) (the trial court "shall modify the parenting plan or allocation judgment in accordance with the child's best interests"). Respondent's contention is not without foundation. Generally, the omission of any of an original statute's language in an amended version of the statute indicates an intention to change the law. *Hamer*, 2013 IL 114234, ¶ 25. However, respondent's contention is unworkable.

¶ 57 In the first place, section 609.2(f) places on the relocating parent the obligation to file a petition seeking approval to relocate. 750 ILCS 5/609.2(f) (West 2018) ("the parent seeking relocation must file a petition seeking permission to relocate"). Respondent concedes that this is at least "a burden of moving forward." (Emphasis omitted.) However, the burden of proof typically consists of both the burden of producing evidence that will satisfy a trial court of the existence of an alleged fact and the burden of persuading a fact finder that the alleged fact is true. *Hamer v.*

*Cain*, 2012 IL App (1st) 112833, ¶ 12. Thus, respondent concedes that the burden of production rests on the parent seeking relocation when the other parent objects to the proposed relocation. The burden of persuasion is also a necessary corollary to give section 609.2(f) its full meaning, because the act of "seeking permission to relocate" implies that the adjudicating tribunal must be persuaded to give its permission. Otherwise, there would be no purpose for the parent seeking relocation to file a petition seeking *permission* to relocate—the relocating parent would need file only a petition to relocate. Section 609.2(f), in conjunction with section 609.2(g), makes the best interests of the child the focus of what must be) proved in the petition seeking permission to relocate. 750 ILCS 5/609.2(f)-(g) (West 2018). Therefore, section 609.2(f) implies that the parent seeking relocation has the burden of proving that the relocation is in the best interests of the child, as measured by the factors set forth in section 609.2(g). *Id.*

¶ 58   Indeed, several cases have held that the party seeking permission to relocate bears the burden of proof. *E.g.*, *Kavchak*, 2018 IL App (2d) 170853, ¶ 65 (relying on *Eckert* and *In re Marriage of Collingbourne*, 204 Ill. 2d 498, 521 (2003), both preamendment cases, in stating that "[t]he party seeking judicial approval of the proposed relocation must establish by a preponderance of the evidence that the relocation is in the child's best interests"); *In re Marriage of Fatkin*, 2018 IL App (3d) 170779, ¶ 34, *rev'd on other grounds*, 2019 IL 123602 (relying on *In re Parentage of P.D.*, 2017 IL App (2d) 170355, ¶ 15, in stating that "[t]he parent seeking relocation has the burden of proving, by a preponderance of the evidence, that relocation would be in the child's best interest"); *P.D.*, 2017 IL App (2d) 170355, ¶ 15 (relying on both the preamendment section 609 and *In re Rogan M.*, 2014 IL App (1st) 141214, ¶ 6, which itself expressly relied on the now-repealed section 609(a), in stating "[t]he parent seeking removal has the burden of proving, by a

preponderance of the evidence, that removal would be in the child's best interest"). Tracing back through these cases shows that they, in fact, relied on either the removal statute (750 ILCS 5/609 (West 2014)) or other cases that drew their burden-of-proof principles from the removal statute. As respondent properly notes, cases cited in support of a point are only as good as the authority on which they themselves are relying. See *Doe 1 v. North Central Behavioral Health Systems, Inc.*, 352 Ill. App. 3d 284, 287 (2004) (where the case cited does not address the issue being contested on appeal, its precedential value is limited). Thus, because the foregoing cases state the burden-of-proof rule as derived from authority preexisting the 2016 amendment to the Act, we cannot simply unreflectively rely upon them, especially where respondent has expressly challenged the trial court's imposition on her of any burden of proof in deciding her petition for relocation.

¶ 59    That does not mean that section 609.2 is without a burden of proof.[2] As noted, the burden of proof is composed of a burden of production and a burden of persuasion. These ideas serve to regulate the administration of a trial. The party bearing the burden of production must bring forth sufficient evidence to support his or her contention and the party bearing the burden of persuasion must convince the fact finder that his or her contention is true. An analogy may be helpful here. The Code of Civil Procedure (Code) defines summary judgment with nowhere stating a burden of proof.[3] 735 ILCS 5/2-1005 (West 2018). Despite this absence, it is beyond argument that the party

---

[2] We note that the general rule in civil cases is that the moving party bears the burden of proof. *Watkins v. American Service Insurance Co.*, 260 Ill. App. 3d 1054, 1062 (1994).

[3] We are mindful that this is not a perfect analogy, because the Code provision on summary judgment was not amended to remove the language regarding a burden of proof. Our purpose is

moving for summary judgment shoulders the burden of first producing sufficient evidence to support its claim and, ultimately, of persuading the trial court that it is entitled to summary judgment pursuant to the standards set forth in the Code. *Country Mutual Insurance Co. v. Hilltop View, LLC*, 2013 IL App (4th) 130124, ¶ 23. So, too, the relocation statute. Section 609.2 sets forth the procedures to accomplish an uncontested relocation. 750 ILCS 5/609.2(c)-(e) (West 2018). The procedure in case of a contested relocation is defined in section 609.2(f) (*id.* § 609.2(f)), and the standards to be applied by the court in both uncontested and contested relocations are defined in section 609.2(g) (*id.* § 609.2(g)).

¶ 60    Respondent's view, that there is no burden of proof, is simply unworkable. The trial court is charged with determining the child's best interests in light of the factors in section 609.2(g). The question is *how* the court does that. If there is no burden of proof, then there is neither a burden of producing evidence on the relevant factors nor a burden of persuading the finder of fact that the relevant factors are proved. If that is the case, then, under respondent's view, the court is expected to somehow formulate a determination of the child's best interests, much like Athena springing fully formed from the brow of Zeus. The legislature cannot have left such a weighty issue to be determined by some undefined *deus ex machina*. *Dynak v. Board of Education of Wood Dale School District 7*, 2020 IL 125062, ¶ 16 (legislature is presumed not to have intended an absurd or inconvenient result). There must be a burden of proof.

---

simply to show that, even in a vacuum, courts must adopt concepts necessary for the logical and orderly disposition of matters in front of them.

¶ 61    Indeed, the language of section 609.2(f) seems to imply the existence of both a burden of production, in that the relocating parent must petition to relocate and produce evidence on the child's best interests, and a burden of persuasion, in that the parent seeking relocation must obtain the trial court's permission to relocate by convincing the court that it is in the child's best interests to relocate. 750 ILCS 5/609.2(f) (West 2018). The court must still view the evidence and arguments through the prism of the child's best interests, as set forth in section 609.2(g), but *someone* must demonstrate that, on balance, the consideration of the child's best interests favors relocation. That someone, structurally, simply must be the parent seeking relocation. As aptly observed by Justice Knecht in an unreported case grappling with precisely this issue, "[w]e do not know if the burden of proof language was purposely or inadvertently left out of the relocation statute, but we believe there must be a burden of proof." *Brown v. Groothuis*, 2018 IL App (4th) 180346-U, ¶ 86.

¶ 62    Respondent argues that the legislative intent to remove the requirement of a burden of proof is evident when we consider a rejected version of the relocation statute. According to respondent, what became section 609.2 represents a compromise between the repealed section 609, which placed the burden expressly on the relocating parent, and the proposed-but-rejected plan to place the onus entirely on the nonrelocating parent, who would be required to file an objection or the relocation would be allowed. 98th Ill. Gen. Assem., House Bill 1452, 2013 Sess. House Bill 1452 also omitted the express burden-of-proof language from the proposed section 609.2 in favor of requiring the trial court to determine whether the relocation would serve the child's best interests. Respondent derives further support for her argument from other provisions that implement the

scheme to require the objecting parent to take action, but we do not believe that they are particularly relevant, especially because the House Bill 1452 version ultimately was not passed.

¶ 63 Respondent also discerns that the now-repealed section 609, with its express burden-of-proof language, provided that the default position was for the status quo, while House Bill 1452, with its requirement that the parent objecting to relocation affirmatively act or the relocation would occur, set the default for relocation. While we are inclined to agree with this observation, the fact that House Bill 1452 was not passed suggests that, ultimately, the decision to change the default from the status quo or nonremoval to relocation was similarly rejected. Moreover, that the relocation statute that was actually enacted, section 609.2 of the Act, omitted the express burden-of-proof language from the repealed section 609 does not suggest a change in the default, although the relocation statute as enacted certainly makes the process of obtaining judicial approval easier if the parties agree. Indeed, the fact that, if the nonrelocating parent simply "fails to sign the notice" of relocation, then the parties must litigate the relocation, suggests that the regime represented by the repealed removal statute has only been modified, not done away with altogether. 750 ILCS 5/609.2(f) (West 2018). While we appreciate respondent's argument, the rejection of a 180-degree change to the statutory framework from that which had prevailed, and the subsequent adoption of a new framework that maintains the key requirement that relocation be litigated in cases of disagreement, cannot be interpreted as broadly as respondent suggests. Instead, the change in the statute suggests the recognition that allowing the parties to agree would minimize the expenditure of both the trial court's and the parties' resources. The fact that the litigation requirement was kept in cases where the parties disagree or do not communicate suggests that the old framework was not entirely rejected.

¶ 64    Two minor points remain for us to make. First, given that a "burden of proof" holds within it the concepts of a burden of production and a burden of persuasion, as well as the concept of the quantum of evidence necessary to prove the point, suggests that the phrase itself is not without ambiguity. If, in fact, the "burden of proof" concept was ambiguous in the now-repealed section 609, then its omission from the relocation statute is of considerably diminished import. *Hamer*, 2013 IL 114234, ¶ 25 ("[a]n amendment of an unambiguous statute indicates a purpose to change the law, while no such purpose is indicated by the mere fact of an amendment of an ambiguous provision"). While we do not declare section 609 to have been ambiguous, the inherent uncertainty of the concept of "burden of proof" undercuts the force of respondent's analysis.

¶ 65    Second, the cases mentioned above interpreting section 609.2 and attributing to the relocating parent the burden of proving that the relocation is in the child's best interests were released in 2017 and 2018. Since their release, the legislature has not amended section 609.2. "[W]here the legislature chooses not to amend terms of a statute after judicial construction, it will be presumed that it has acquiesced in the court's statement of legislative intent." *Board of Education of City of Chicago v. Moore*, 2021 IL 125785, ¶ 30. Granted, the relocation statute has been in existence only a brief time and the judicial gloss imparted to it is still relatively trifling. *Cf. id.* (the provision at issue had been interpreted in 1987 and there had been "numerous" amendments not disturbing the original judicial interpretation). Therefore, the principle of legislative acquiescence is not particularly weighty here, but it is undeniably present. While not determinative, it supports our interpretation of section 609.2.

¶ 66    For these reasons, then, we reject respondent's contention that the legislature removed the burden of proof from section 609.2. Because we hold that section 609.2 places on the parent

seeking relocation the burden of proving that relocation is in the child's best interests, the trial court did not err in assigning that burden to respondent in its March 3, 2020, order.

¶ 67                 C. Denial of the Amended Petition for Relocation

¶ 68     Respondent contends that the trial court's denial of her amended petition for relocation was against the manifest weight of the evidence. As discussed above, in 2016, the Act was amended, and the former removal statute was repealed and replaced with the relocation statute. The relocation statute changed somewhat the procedures a party must follow to take his or her child out of the state, allowing the parties to agree to a relocation without the necessity of filing a petition and undergoing a hearing. 750 ILCS 5/609.2(c)-(e) (West 2018). Section 609.2(f) applies where the parties cannot agree to a relocation. *Id.* § 609.2(f). Section 609.2(g) sets forth the standards the trial court is to use in determining the child's best interests in a relocation request:

>"The court shall modify the parenting plan or allocation judgment in accordance with the child's best interests. The court shall consider the following factors:
>
>>(1) the circumstances and reasons for the intended relocation;
>>
>>(2) the reasons, if any, why a parent is objecting to the intended relocation;
>>
>>(3) the history and quality of each parent's relationship with the child and specifically whether a parent has substantially failed or refused to exercise the parental responsibilities allocated to him or her under the parenting plan or allocation judgment;
>>
>>(4) the educational opportunities for the child at the existing location and at the proposed new location;

(5) the presence or absence of extended family at the existing location and at the proposed new location;

(6) the anticipated impact of the relocation on the child;

(7) whether the court will be able to fashion a reasonable allocation of parental responsibilities between all parents if the relocation occurs;

(8) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to relocation;

(9) possible arrangements for the exercise of parental responsibilities appropriate to the parents' resources and circumstances and the developmental level of the child;

(10) minimization of the impairment to a parent-child relationship caused by a parent's relocation; and

(11) any other relevant factors bearing on the child's best interests." *Id.* § 609.2(g).

¶ 69 Our supreme court recently issued *Fatkin*, 2019 IL 123602, an emphatic decision regarding the standard of review in relocation cases and how to employ that standard. The court explained that a trial court's determination of the child's best interests should not be disturbed unless it is " 'clearly against the manifest weight of the evidence and it appears that a manifest injustice has occurred.' " *Id.* ¶ 32 (quoting *Eckert*, 119 Ill. 2d at 328). The supreme court further explained that the deferential standard of review was appropriate due to the trial court's opportunity to observe the parents and children, giving it the ability to assess and evaluate their temperaments, personalities, and capabilities. *Id.* The supreme court concluded that the presumption in favor of

the trial court's determination was always strong and compelling in a best-interests-determination type of case. *Id.*

¶ 70     The supreme court then provided an illustration of the principles of review, in two brutally concise paragraphs. In the first paragraph, the supreme court briefly discussed the trial court's order on the father's relocation petition, discussing the bases the trial court provided for its decision. *Id.* ¶ 33. The supreme court then held that "that there is absolutely no basis for concluding that the trial court's decision to grant Todd's relocation petition is so 'clearly against the manifest weight of the evidence' that 'it appears that a manifest injustice has occurred.' " *Id.* (quoting *Fatkin*, 2018 IL App (3d) 170779, ¶ 34). In particular, the supreme court castigated the appellate court's lip service to the manifest-weight standard while its decision actually subverted the standard:

> "[T]he appellate court below made no attempt to apply the applicable standard of review. On the contrary, after setting out the applicable language from *Eckert*, the appellate court proceeded simply to reweigh the evidence for itself and decide that the scales favored denial of the petition. At no point did the appellate court identify what evidence the trial court's decision was 'clearly' and 'manifestly' against, what 'manifest injustice' it was seeking to avert, or why suspension of the 'strong and compelling' presumption in favor of the trial court's decision was warranted." *Id.* ¶ 34 n.2.

¶ 71     With these principles in mind, we make one further observation regarding our review of the trial court's determination. In relocation cases, courts have consistently cautioned that a best-interests determination cannot be reduced to a simple bright-line test and instead must be made on a case-by-case basis. *Id.* ¶ 32; *Eckert*, 119 Ill. 2d at 326; *Kavchak*, 2018 IL App (2d) 170853, ¶ 65.

This suggests that other relocation cases are of limited value for purposes of comparison because the result in each case depends on the unique facts and circumstances of the case. *In re Marriage of Berk*, 215 Ill. App. 3d 459, 465-66 (1991). Because of the case-by-case nature of our review, the result cannot be reduced to a simple tally of which party "won" a majority of the enumerated factors; instead, because some factors in a particular case may weigh more heavily than others, the trial court must consider all factors and evidence touching on the issue and must arrive at a reasonable result. *P.D.*, 2017 IL App (2d) 170355, ¶ 49. With all aspects of the preceding discussion in mind, we turn to the trial court's decision here.

¶ 72    The trial court presided over an extremely bitter and contested divorce, spanning nearly three-and-a-half years. Regarding the relocation issue, the court held a multiday hearing during which the parties were given a full and fair opportunity to present their evidence. Notably absent from the hearing were respondent's sister and mother, both of whom respondent testified that she would rely upon if she were allowed to relocate: the sister, by providing a dwelling and links to possible employment opportunities in California, and the mother, by assisting respondent with taking care of S.L.

¶ 73    Initially in its remarks, the trial court focused on the best-interests factors developed through the case law and, specifically, the factors set forth in *Eckert*. The court first noted that both parties had credibility issues. The court deemed incredible petitioner's account of his lack of involvement in the May 29, 2017, attack on respondent. Likewise, the court deemed incredible respondent's multiple complaints of petitioner's violence and danger to S.L. The court concluded that neither party could work cooperatively with the other, both had used S.L. to further their aims in the divorce proceedings, and it would be better for all concerned if the parties did not have to

deal with each other insofar as was possible. This conclusion was drawn from ample evidence in the record as well as from the trial court's superior position in observing the parties testify.

¶ 74   While the trial court deemed petitioner's account of his lack of involvement in the 2017 attack on plaintiff incredible, it could not conclude that petitioner participated in the planning or execution of the attack, or that petitioner knew in advance when the attack would occur. The court stated that, from its review of the evidence, and particularly in view of the parties' failure to call Voronin to testify to whether and how petitioner was involved, it was impossible to determine whether petitioner went beyond a vague approval of the attack, shown in his posting bond for Marozau and thus allowing him to continue to pose a threat to respondent. Again, this conclusion, that petitioner was tangentially involved but not directly involved, is supported by ample evidence in the record.

¶ 75   The court then considered the *Eckert* factors specifically, and it stated that Marozau's violent attack was the primary factor supporting respondent's petition for relocation. While the attack was extremely concerning, the court noted that no other instances of physical violence had occurred during the pendency of the case, and this is borne out in the record. The court also observed that respondent had no job lined up in California. Further, it doubted that her job prospects would be very good and especially doubted respondent's claim that she had a lead on a paralegal job, because respondent had consistently used a language interpreter in all important hearings, which suggested that her English language skills were marginal and might hamper her ability to find English-language-intensive positions, like that of a paralegal at a law firm. This conclusion appears to be based on the court's observations and to be a rational inference for which the court had a reasonable explanation. The court then expressed concern that the level of planning

present in other relocation cases was lacking here. It noted that respondent had not investigated the schools in California (and this was confirmed by Lewinthal), respondent and S.L. would have to share a bedroom in the proposed living arrangements, and respondent had demonstrated no means by which she could support herself.

¶ 76     The court balanced the foregoing against the likelihood, given the parties' limited means, that relocation would effectively sever petitioner's parental bond with S.L. altogether. The court noted that it was extremely unlikely that the parties could cooperate, especially regarding the strain of frequent travel between California and Chicago. The court discussed that petitioner had fully and consistently exercised his parental time throughout the case, and it noted that respondent had frequently attempted to limit and interfere with petitioner's parenting time. In that regard, the court again highlighted respondent's baseless reports of abuse and her videotaping of visitation exchanges, and it juxtaposed this against respondent's admission during her testimony that she did not believe that petitioner posed a danger to S.L. or would harm the child.

¶ 77     The trial court considered whether each party could foster a good relationship between S.L. and the other parent. The court concluded that, based on the manifest rancor between the parties, there was simply no way the parties could be expected to do this. Indeed, the court found that each party was responsible for undercutting the other, from the derogatory songs that S.L. would sing after spending time with petitioner, to respondent's unfounded reports of petitioner abusing S.L. Again, there is ample evidence in the record supporting the trial court's conclusion.

¶ 78     The trial court also considered the effect the proposed relocation would have on parenting time. It noted that respondent had no means of support lined up in California and that the parties' economic resources, in general, were not abundant. Specifically, the court noted that respondent

would lack the economic ability to participate in the cost of the travel that would be required and would lack inclination to do so even if she had the resources. Again, there was evidence in the record to support the trial court's conclusion.

¶ 79 Other factors the trial court considered in this phase of its remarks included petitioner's strong interest in S.L., and this was supported by his consistent record of exercising all of his parenting time. The court also considered whether respondent wanted to relocate to preserve a committed relationship, and it concluded that the proposed relocation was solely to physically distance herself from petitioner. While the court termed this factor "compelling," the court noted that it was due to the previous physical harm caused by a third party and that it did not change the court's calculus overall, regarding the factors under consideration. Finally, the court considered whether respondent had established by a preponderance of evidence that the proposed relocation would be in S.L.'s best interests, and it found that the evidence did not satisfy that threshold.

¶ 80 We have carefully reviewed the record and, as noted, have found evidence supporting the trial court's factual determinations. We cannot say, therefore, that the trial court's conclusions discussed in the first phase of its remarks, where it was considering S.L.'s best interests in light of *Eckert* and its progeny, were against the manifest weight of the evidence. We will comment that, considering the repeated recognition that these sorts of best-interests determinations must be considered on a case-by-case basis, the trial court's analysis distinguishing various cases presented by respondent was mildly misplaced. See *Berk*, 215 Ill. App. 3d at 465-66 (recognizing that the case-by-case nature of the consideration of a child's best interests renders the comparison of cases a fruitless endeavor due to the unique circumstances presented in each case).

¶ 81    The trial court then turned to its review of the statutory factors set forth in section 609.2. Many of the court's comments echo or repeat those given in the first, *Eckert*-factor phase of the court's remarks. Starting with the first factor, the court concluded that respondent had "good reason to be fearful" of petitioner. This conclusion is obviously based on the Marozau attack and the trial court's belief that, while it could not say that petitioner commissioned, planned, or participated before the fact in the attack, petitioner's actions after the attack suggested that he at least approved of the attack. Moreover, the fact that petitioner posted bail for Marozau allowed Marozau to remain unincarcerated and represented an implicit threat by petitioner (acting through others) to respondent's safety. However, in the court's eyes, the circumstances and reasonableness of respondent's motives for relocating were not decisive on the central question of whether the move would be in S.L.'s best interests. Under the second factor, the court considered petitioner's motives for resisting the proposed relocation and determined that, because of petitioner's interest in S.L. and the likelihood that the rancorous relationship between the parties would mean that such a move would sever petitioner's parental bonds with S.L., his opposition was sincerely motivated toward maintaining his role in S.L.'s life. Our review of the record shows that there was evidence supporting these conclusions.

¶ 82    The third factor concerns the history and quality each parent's relationship with S.L. and whether a parent takes advantage of his or her parenting time. The trial court noted that petitioner consistently exercised his parenting time. The court also noted that, in multiple text messages or e-mails, respondent resisted accommodating minor changes to pick-up times and locations or otherwise cooperating with petitioner "in seeking that the child had time with her father." We have

reviewed the record, and it contains text messages supporting the trial court's observations and conclusions.

¶ 83    The trial court noted that respondent had not carefully developed evidence on the fourth factor, dealing with S.L.'s educational opportunities in both locations. The court was made aware that the California schools had a generally good reputation but that the schools near respondent's residence in Chicago also were well regarded. We note that Lewinthal had indicated that respondent had not done any research into the educational opportunities in California. The court appears to have viewed this factor as neutral, both because of the paucity of respondent's investigation and because the information that was presented indicated that the existing and proposed educational opportunities were reasonably equivalent.

¶ 84    The trial court commented that the record showed that the fifth factor, dealing with the presence of extended family in both the current and proposed locations, was not very well developed. The trial court observed that respondent's sister, who did not testify, lived in the California location, which would be an improvement for respondent, who did not appear to have any family in the Chicago area. The court also noted that, on the other hand, there were half-siblings from petitioner's previous marriages present in the Chicago area. We note that there was no testimony about the frequency of S.L.'s visits with petitioner's other children or the quality of S.L.'s relationships with them and other members of his family.

¶ 85    On the sixth factor, the anticipated impact the relocation would have on S.L., the court observed that neither party presented any testimony or information regarding this. According to the court, there was no "evidence that the child would be negatively or positively impacted by this [proposed] relocation."

¶ 86    The trial court considered the seventh factor, whether it could reasonably allocate the parental responsibilities if the relocation were allowed. It concluded that, given the hostility between the parties, there would be no way that it could expect them to cooperate and it worried that respondent would initiate further actions in California, despite anything the court might write in an order about retaining jurisdiction. While not express, the court was referring not just to the relocation but also to other complaints respondent raised, such as the sexual abuse accusations that repeatedly were determined to be unfounded in this jurisdiction. Again, our review shows that the court based its conclusion on evidence present in the record.

¶ 87    Regarding the eighth factor, S.L.'s wishes, the court determined that, because S.L. was too young at this point, it was to be expected that there was no evidence adduced on this topic.

¶ 88    Looking at the ninth factor, whether it could fashion an appropriate allocation of the exercise of parental responsibilities given the constraints of the parties' resources and circumstances, the court doubted that it could. It recognized that the parties had expended tremendous economic resources in litigating their extremely rancorous divorce and that, as a result, their means had become limited. The court also determined that S.L. likely could not travel independently to and from California and that the travel required to reproduce the current allocation of parental responsibility would be prohibitively expensive. There is evidence in the record to support the trial court's determination.

¶ 89    The trial court considered the tenth factor, the impairment of the parent-child relationship that would occur if relocation were allowed. The court concluded that relocation would likely effectively terminate petitioner's involvement with S.L. The court based the conclusion on the

parties' lack of cooperation and the likelihood that respondent would not be inclined to foster that involvement.

¶ 90    As to the catch-all consideration of any other factors, the trial court discussed that the parties had not presented much evidence about S.L. and that it had no feel for how S.L. would react to the relocation. The court generalized that children like stability and that the current arrangements had been in place for several years and had continued with little to no judicial involvement for at least a year.

¶ 91    Based on its consideration of the factors, the trial court concluded that relocation would not be in S.L.'s best interests. Looking at that decision through the lens of *Fatkin*, we cannot say that the court's factual determinations were against the manifest weight of the evidence. We have commented throughout that they were based on evidence appearing in the record. Moreover, many determinations involved weighing the evidence and the conclusions appear reasonable in light of the court's stated bases for each determination. Likewise, we do not believe that a manifest injustice would occur as a result of the trial court's decision. The court emphasized the speculative nature of respondent's request to relocate. There was no particularly detailed level of planning. Respondent did not have a job offer in hand, although she attempted to explain that by noting the uncertainty of the timing of the move. Nevertheless, she did not present a job offer or objective evidence from any potential employers. Likewise, respondent did not research the educational opportunities for S.L., leaving that to Lewinthal to do on her behalf. While both Lewinthal and Pacheco opined that relocation should be allowed, their opinions were based on statements petitioner made that he explained to the court's satisfaction as misunderstandings. Specifically, petitioner explained that he felt that, if relocation occurred, he would have to withdraw his contact

with S.L. because of respondent's history of making accusations of abuse. The court accepted this explanation, and it noted that, during the hearing, respondent expressly conceded that she did not believe that petitioner would harm S.L. We credit the court's determination because the court was in a far superior position to determine petitioner's credibility and sincerity than are we in reviewing a cold record. The court provided a thorough, supported, and well-reasoned explanation of its decision. Accordingly, we affirm the trial court's judgment.

¶ 92    We now turn to respondent's specific critiques of the trial court's decision. Respondent, understandably, gives paramount importance to the Marozau attack and argues that this entirely justifies her decision to move. Respondent points to several acts of violence about which she testified at the trial. She also highlights threats that petitioner made to her and the 2017 order of protection to demonstrate that the trial court's conclusion that there had been only a single act of violence was against the manifest weight of the evidence. The trial court was entirely aware of the parties' conduct throughout the case. Indeed, the trial court maintained that it would include provisions minimizing the parties' interactions in the final orders to relieve some of the friction and tension. The trial court indicated that it had issues with respondent's testimony during the hearing, including her testimony about the threats.

¶ 93    On the other hand, the trial court did not simply accept petitioner's testimony as gospel. It discounted petitioner's claims that he was totally uninvolved in the Marozau attack, although it could not conclude whether petitioner was involved in the attack before the fact or anything more than approval of it after it had occurred. Likewise, the court rejected petitioner's denials that he taught S.L. to make derogatory comments and sing songs about respondent.

¶ 94    In other words, the record shows that the trial court carefully and critically considered the parties' testimony. We cannot reject the trial court's superior position and consideration of the live evidence in favor of our own evaluation of the cold record. *Fatkin*, 2019 IL 123602, ¶ 34 n.2 (it is improper for the appellate court to reweigh the evidence and substitute its judgment for that of the trial court). We cannot say that the trial court's judgment was against the manifest weight of the evidence.

¶ 95    Respondent specifically argues that the trial court's conclusion that only a single act of violence occurred, from the case's inception until the court's judgment, was against the manifest weight of the evidence. In support, respondent highlights her testimony about several incidents in 2015 and 2017. In addition, respondent contends that she was often threatened by petitioner, and she counts this as part of the violence against her. As noted, the trial court considered all of the testimony and determined that respondent's testimony about the violence and abuse was not entirely credible. Our review of the record demonstrates that many of the exchanges occurred in a police department, and respondent testified that petitioner would often threaten her during exchanges. The record, however, is barren of any witnesses to these threats occurring within feet of on-duty police officers. Thus, we conclude that the trial court's conclusion regarding the single act of violence is not unfounded and is based on reasonable interpretations of the evidence in the record. With that said, the trial court was clearly extremely concerned because of the Marozau attack and petitioner's involvement in it, and it emphasized that any additional violence against respondent would not be tolerated and would immediately result in a reconsideration of its decision. Again, based on our review of the record, we cannot say that the trial court's remarks were unfounded or not based on the evidence and the reasonable inferences arising from it.

¶ 96    Respondent also asks us to jettison the trial court's conclusion that petitioner was not forewarned about the Marozau attack and did not participate in it before-the-fact. Respondent emphasizes the evidence that there were substantial financial payments from petitioner to Marozau shortly before the attack, petitioner's prevarications with Lewinthal, and the evolution of petitioner's explanations to Lewinthal and Pacheco and even in his testimony during the trial. However, the trial court received this evidence and clearly considered it. The trial court was in a superior position to observe the witnesses and to determine their credibility. Respondent is asking us to substitute our judgment for that of the trial court without acknowledging any of the weaknesses in her position. For example, respondent does not mention that the issue was not developed with testimony from Voronin or that the police investigation failed to turn up sufficient evidence to demonstrate petitioner's involvement (and we do not detect that respondent is arguing that the trial court applied an erroneous standard to its consideration of the effect of the police investigation or the inferences it drew from the lack of Voronin's testimony). In effect, respondent is requesting that we reconsider the evidence in the light most favorable to her, rather than under the appropriate manifest-weight standard. *Id.* ¶ 32. That we cannot do. We reject respondent's contention.

¶ 97    Next, respondent challenges the trial court's conclusion that respondent interfered in petitioner's parenting time and with the parent-child relationship between petitioner and S.L. She challenges the trial court's evaluation of the evidence regarding her allegations of sexual abuse. This is another request to substitute our judgment for that of the trial court, and we reject the contention. *Id.*

¶ 98    Respondent contends the court erred as a matter of law in considering that she had placed even slight roadblocks in the way of the parent-child relationship between petitioner and S.L. In order to make this argument, respondent presumes that we accept her previous argument regarding petitioner's violence toward her during both the marriage and the pendency of the case. As we have rejected that earlier contention, it cannot be used to form the basis of this contention. Accordingly, we must reject it.

¶ 99    Next, respondent challenges the trial court's determination that petitioner was sincerely trying to protect his relationship with S.L. by opposing relocation. We have carefully reviewed the record and conclude that the trial court's determination was not against the manifest weight of the evidence. Respondent argues that petitioner's statements to Pacheco and Lewinthal about withdrawing from contact with S.L. illustrate his lack of commitment to the relationship and reveal an improper motivation for opposing relocation. Respondent also points to the minimal relationships petitioner has with his other children, suggesting that, as with them, so with S.L. We disagree.

¶ 100    Respondent presents petitioner's statements to Pacheco and Lewinthal isolated from his trial explanation. As petitioner explained, given the history of respondent's allegations that he sexually abused S.L., he was fearful that the allegations would continue and that he would be jailed even though the allegations were unfounded. Respondent does not mention this testimony, relating only that petitioner denied that he made the statements (and respondent does not support this reference with a citation to the record). Further, while it is lamentable that petitioner has little to no relationship with his other children, throughout the course of this case, petitioner has consistently and fully availed himself of his parenting time and has forged a relationship with S.L.

The trial court also observed the testimony and was aware of these facts in rendering its determination on this point. We cannot say that the court's determination was against the manifest weight of the evidence. *Id.*

¶ 101 Respondent argues that the trial court erred by considering only whether petitioner fully exercised his parenting time and that it should have also considered the history and quality of his relationship with S.L. Section 609.2(g)(3) states that the court is to consider "the history and quality of each parent's relationship with the child and specifically whether a parent has substantially failed or refused to exercise the parental responsibilities allocated to him or her under the parenting plan or allocation judgment." 750 ILCS 5/609.2(g)(3) (West 2018). The court's focus was in line with the factor as stated in the Act. Moreover, as we have observed above, the hearing was unusual because the parties presented S.L. not on her own terms but only as a vehicle to demonstrate one or the other party's failures. The trial court commented that neither party had presented it with the opportunity to get a feel for S.L.'s personality and how she might react to changes in the parenting allocation. Indeed, the trial court criticized both parents for using S.L. to further their own goals in this case. Finally, we observe that respondent's argument is actually a request that we reject how the trial court evaluated this factor. She would have us emphasize the "history and quality" of petitioner's relationship with S.L. and rebalance the calculus in her favor, rather than apply the manifest-weight review to the issue. Because the trial court's determination regarding this factor is amply supported in the record, we cannot conclude that it was against the manifest weight of the evidence. *Fatkin*, 2019 IL 123602, ¶ 32. To the extent that respondent alleges that the trial court misapplied the law, we note that she would simply prefer the court to have concentrated on a different aspect of the factor than the court did, which pinpoints not an

error applying the law, but a disagreement with how the law was (in our view, correctly) applied. For these reasons, we reject respondent's contention.

¶ 102   Next, respondent contends that the educational opportunities in California are superior to those in Illinois. This contention is not so much a claim that the trial court misapprehended the evidence or considered improper evidence or aspects pertaining to the factor; it is rather a plea that we reweigh the evidence and substitute our judgment for that of the trial court. We decline the invitation. *Id.* ¶ 34 n.2.

¶ 103   Respondent next contends that the factor dealing with extended family at the proposed location and the current location favors relocation. Respondent reiterated that she has a good and close relationship with her sister, with whom she and S.L. would live. In its comments, the trial court made this point. Respondent then complains that the court mentioned cousins and siblings in the Chicago area, and she purports to understand the comment to be directed at her. This is a clear misapprehension of the trial court's comments. In making the statement about siblings and cousins, the trial court was clearly addressing *S.L.*'s cousins and siblings, not respondent's. With that said, the court's analysis said little regarding S.L.'s siblings and cousins on her father's side, which might be because the evidence demonstrated that petitioner had poor relationships with his children and his own family. The court simply noted that it appeared that petitioner had family in the area. This is because the evidence demonstrated that petitioner had poor relationships with his children and his own family, but it appeared that petitioner had family in the area. We believe that this factor does favor relocation, although the trial court's comments are not clear on the point. However, as noted, this is not simply an exercise of totting up who "won" each factor, with the greater number of "wins" determining the outcome. *P.D.*, 2017 IL App (2d) 170355, ¶ 49. While

the extended-family factor favors relocation, the trial court appears to have placed appropriate weight on it and, under any measure, it would not likely be outcome- determinative on its own.

¶ 104 Respondent next argues that the trial court's determination that there was no evidence about the relocation's impact on S.L. was against the manifest weight of the evidence. Respondent illustrates her argument with her own testimony about petitioner's violent and threatening behavior. While it is true that respondent testified about petitioner's violent actions, controlling behavior, and threats, the trial court, who observed the testimony and presided over the entirety of this case, discounted the credibility of the testimony. Given the trial court's superior position, we are not in a position to gainsay its credibility determination or the weight that it placed on the testimony. *Fatkin*, 2019 IL 123602, ¶ 34 n.2. Moreover, there was no testimony directly on the impact on S.L. The parties did not significantly explore S.L.'s bonds with friends or family or whether she had friends in each parent's neighborhood. The closest thing to impact evidence was petitioner's testimony that S.L. was taken to worship with his family and that the temple had special classes for children. Even that testimony, however, did not really touch on whether S.L. had forged bonds with the congregants and their children. Respondent's reliance on her testimony about petitioner's violence to substitute for any direct testimony regarding S.L.'s attachments and socialization fully indicates respondent's awareness that such testimony was not produced during the hearing. We add that we do not dispute respondent's point: that removing S.L. from a violence-filled environment would have a beneficial impact on S.L. However, the trial court explained why it discounted the testimony regarding petitioner's violence, and we have determined that it was a reasoned decision supported by evidence in the record and reasonable inferences from that evidence. Accordingly, we reject respondent's contention.

¶ 105   Next, respondent challenges the trial court's determination that it could not fashion a reasonable allocation of parental responsibilities if relocation were allowed. Respondent deconstructs the court's comments to attempt to rebut each individual comment while ignoring the thrust of the court's analysis. The court noted that the parties would not cooperate, considered the arduous and expensive travel requirements for a child of tender years, and opined that, if relocation occurred, it would, *de facto*, result in the severance of the parent-child bonds between petitioner and S.L.  We have carefully reviewed the record and believe that the trial court's decision was reasoned, reasonable, and based on the evidence before it. We cannot say that this determination was against the manifest weight of the evidence.

¶ 106   Respondent focuses on the travel, noting that travel alone cannot be a barrier to relocation, or relocation would never be allowed. See *In re Marriage of Tedrick*, 2015 IL App (4th) 140773, ¶¶ 59-60. The focus, however, is misplaced, because the trial court was balancing the requirement of lengthy, and perhaps unaccompanied, travel with the parties' resources and their track record of failing to foster S.L.'s relationship with the other parent. We cannot say that the focus on the parties' undermining of each other was improper. As such, the other comments are relatively tangential and respondent's dispute of each in minute detail does not disturb the fact that, in the trial court's reckoning, the parties amply demonstrated their inability to cooperate and to foster each other's relationship with S.L. and that this renders the fashioning of a parental allocation a futile exercise. We reject respondent's contention.

¶ 107   Respondent next contends that the trial court's determination of the infeasibility of allocating parental responsibilities appropriate to the parties' resources was against the manifest weight of the evidence. Respondent argues that there was evidence that petitioner did not lack

resources, because there was "ample evidence of [petitioner's] financial resources." While true, the court also noted that the three years of highly contentious divorce proceedings had diminished those resources, and respondent's argument does not take that into account. Further, respondent points to nothing concrete beyond the facts that, at the beginning of these proceedings, petitioner was able to post a $100,000 bond and had transferred around $150,000 in cash and assets to Marozau shortly before. For example, respondent does not indicate petitioner's annual earnings, his assets on hand at the time of the proposed relocation, or his investments. Indeed, the contention is made in a factual vacuum with no assistance to this court concerning where in the record the information can be found, if it exists. See *Obert v. Saville*, 253 Ill. App. 3d 677, 682 (1993) (it is not the appellate court's obligation to comb the record for contentions of error). We cannot say that the trial court's determination was against the manifest weight of the evidence.

¶ 108 Respondent last argues that the trial court's determination that it could not minimize the disruption to the parent-child relationship between petitioner and S.L. was against the manifest weight of the evidence. This contention combines a request to reweigh the evidence with a substantial amount of "but what about petitioner's conduct." Respondent's contention is topped off by highlighting the parties' agreements to settle outstanding issues in the ongoing litigation as examples of their ability to cooperate. We have discussed the trial court's conclusion that each party continually undermined the other and attempted to interfere with his or her parent-child relationship, and we see no reason to repeat that discussion or to disturb our determination that the trial court's conclusion was not against the manifest weight of the evidence. We further cannot say that settlement in litigation matters exemplifies an ability to cooperate. Given the apparent animus between the parties, we, like the trial court, do not believe that the parties had a sudden change of

heart as they wrapped up the remaining outstanding issues. To our mind, it is just as likely that the resources consumed in this litigation were beginning to run dry, requiring some measure of give and take to attain a final judgment. Thus, because the contention boils down to a request to reweigh the evidence, we reject respondent's contention. *Fatkin*, 2019 IL 123602, ¶ 34 n.2.

¶ 109   Finally, we note that the consideration of which way each factor of a best-interests determination leans is a good analytical tool. However, parties must not lose sight of the necessity that the trial court, and consequently the court on review, consider, case by case, all circumstances touching on the child's best interests. *Kavchak*, 2018 IL App (2d) 170853, ¶ 65. Further, reliance on only a factor-by-factor analysis may lead the party to a simple evaluation of how many factors he or she should have "won," and this reduces the best-interests determination to the bright-line rule cautioned against in the case law. *P.D.*, 2017 IL App (2d) 170355, ¶ 49. The paramount consideration is the child's best interests, and our review of a trial court's best-interests determination attempts to understand not only how the factors fell or should have fallen, but the weight accorded each and the reasons why.

¶ 110   Accordingly, we will not add up which party "won" the greater number of factors. It is sufficient that our comments above clearly indicated that we cannot say that the trial court's judgment denying respondent's amended petition for relocation was clearly against the manifest weight of the evidence or that its decision worked a manifest injustice.

¶ 111   Finally, pursuant to Illinois Supreme Court Rule 311(a)(5) (July 1, 2018), our decision in this case was to be filed on or before February 22, 2021. There were no filing delays in the record or the brief in this case, although some time was lost due to petitioner's silence about his decision not to file a brief. The issues of jurisdiction and the interpretation and analysis of the relocation

statute required additional time. We propose that good cause exists for issuing our decision after February 22, 2021.

¶ 112                                   III. CONCLUSION

¶ 113   For the foregoing reasons, the judgment of the circuit court of Lake County is affirmed.

¶ 114   Affirmed.

**No. 2-20-0552**

| | |
|---|---|
| **Cite as:** | *In re Marriage of Levites*, 2021 IL App (2d) 200552 |
| **Decision Under Review:** | Appeal from the Circuit Court of Lake County, No. 17-D-747; the Hon. Charles William Smith, Judge, presiding. |
| **Attorneys for Appellant:** | Lena Goretsky Winters, of Winters Family Law Firm, and David Winters, Andrew Foreman, and Bide Akande, of Porter Wright Morris & Arthur LLP, both of Chicago, for appellant. |
| **Attorneys for Appellee:** | No brief filed for appellee. |