NOTICE

Decision filed 12/08/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 210197-U

NO. 5-21-0197

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| MEGHAN SIEGEL, | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellant, | ) | Madison County. |
| | ) | |
| v. | ) | No. 20-D-180 |
| | ) | |
| MATTHEW W. SIEGEL, | ) | Honorable |
| | ) | Veronica L. Armouti, |
| Respondent-Appellee. | ) | Judge, presiding. |

JUSTICE BARBERIS delivered the judgment of the court.
Presiding Justice Boie and Justice Moore concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm the circuit court's June 7, 2021, judgments where the court denied petitioner's petition for temporary and permanent relocation, ordered petitioner to pay respondent's attorney fees of $7533.33 for prior litigation, allocated decision-making responsibilities for schooling and extracurricular activities to respondent, ordered the parties to use proceeds from the sale of the marital residence to pay two outstanding marital credit card debts, and awarded respondent sole ownership of his retirement IRA account. We, however, reverse and remand the court's allocation of spousal maintenance and its finding ordering petitioner to pay 40% of daycare expenses upon employment.

¶ 2    This appeal arises from the circuit court's June 7, 2021, orders concerning the petitions for temporary and permanent relocation and for dissolution of marriage filed by petitioner, Meghan Siegel, against respondent, Matthew Siegel. On appeal, Meghan argues that the court's order was against the manifest weight of the evidence as to: (1) the denial of Meghan's petition for temporary and permanent relocation, (2) the award of sole discretion on issues of schooling and

1

extracurricular activities to Matthew, (3) the distribution of the marital property, (4) the division of marital debt, and (5) the amount of maintenance awarded. In addition, Meghan asserts that the court abused its discretion in (1) sanctioning Meghan for temporarily leaving Illinois with the parties' daughter, K.S., in March 2020, and (2) ordering Meghan to pay 40% of daycare costs upon employment.

¶ 3    This is an accelerated appeal under Illinois Supreme Court Rule 311(a) (eff. July 1, 2018). Under Rule 311(a)(5), this court is required to issue a decision within 150 days after the filing of the notice of appeal, except for good cause shown. Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). Here, Meghan filed a timely notice of appeal on July 6, 2021. Thus, the 150-day period to issue our decision expired on December 3, 2021. Meghan's brief was due for filing on August 27, 2021. We note, however, that on August 30, 2021, Meghan filed a motion for leave to file her brief *instanter*. This court granted Meghan's motion on August 30, 2021, and also allowed Matthew to file his brief within 21 days. Taking this into consideration, we find good cause for issuing our decision after the 150-day deadline. Accordingly, we issue our disposition as follows.

¶ 4                                  I. Background

¶ 5    On September 14, 2018, Meghan and Matthew married in Illinois. On April 7, 2019, they had one daughter, K.S. The parties' marital residence was located in Edwardsville, Illinois.

¶ 6    On July 2, 2019, Meghan filed a petition for judgment of dissolution of marriage (19-D-557) following an alleged incident of domestic violence in June 2019 where Matthew was arrested and charged with disorderly conduct. Meghan claimed K.S. was present during this incident. The circuit court entered a temporary order allowing Meghan to leave Illinois with K.S. to relocate to her parents' home in Tennessee until the next scheduled hearing on July 19, 2019. Matthew filed petitions for a temporary restraining order (TRO) and allocation of parental decision-making (19-

2

F-374).[1] On August 5, 2019, the parties entered an agreed upon order to dismiss case numbers 19-D-557 and 19-F-374, which included Meghan's consent to the dismissal of the disorderly conduct charge against Matthew. Shortly thereafter, Meghan and K.S. returned to Illinois.

¶ 7     On March 3, 2020, Meghan filed a second petition for judgment of dissolution of marriage, which is the subject of this appeal, alleging that Matthew had a "history of violence and abuse toward Petitioner and the minor child." Meghan also filed a petition for temporary and permanent relocation of K.S. from Illinois to Tennessee, alleging that Matthew had physically and emotionally assaulted both her and K.S. On that same day, without a court order, Meghan relocated to Tennessee with K.S. According to a text message exchange between Meghan and Matthew, Meghan informed Matthew of the relocation after they arrived in Tennessee.

¶ 8     On March 6, 2020, Matthew filed a petition for a TRO and/or preliminary injunction. Matthew also filed a petition requesting that the circuit court enter an order requiring Meghan to immediately return K.S. to Madison County, Illinois, or within 50 miles, or in the alternative, award Matthew primary residential parenting time. Matthew claimed that Meghan was living in Tennessee with K.S. without Matthew's consent. Additionally, Matthew argued that Meghan failed to file a notice of intent to relocate before she left Illinois and traveled to Tennessee. Matthew alleged that Meghan was "suffering from a psychiatric illness" and had been smoking while breastfeeding. Due to the COVID-19 pandemic, the circuit court entered an administrative order continuing the cause to April 20, 2020.

¶ 9     On April 14, 2020, Meghan filed a petition for interim attorney fees and costs. She also filed a petition for temporary relief claiming she had no access to money after Matthew cancelled her credit cards. Meghan requested that the circuit court enter an order requiring Matthew to pay

[1]Matthew was ordered to pay temporary child support in the amount of $1000 per month.

child support, $2000 in monthly maintenance, and all attorney fees and marital debts. Additionally, Meghan requested that the court grant her all decision-making and parenting time with K.S. and order Matthew to pay for K.S.'s medical insurance and daycare expenses on a temporary basis.

¶ 10    On April 22, 2020, the circuit court held a videoconference via Zoom on Matthew's March 6, 2020, petitions. The following testimony was adduced at the hearing.

¶ 11                            A. Mike Siegel

¶ 12    Mike Siegel, Matthew's father, testified that he lived across the street from his granddaughter, K.S., before Matthew and Meghan moved to Edwardsville. During that time, he saw K.S. three times a week. Mike testified that he had not seen K.S. since Meghan relocated to Tennessee in March 2020. Mike believed that Meghan initially interacted well with his family, but at some point, she became disconnected and disinterested in attending family functions.

¶ 13                            B. Rebecca Siegel

¶ 14    Rebecca Siegel, Matthew's mother, testified that she last saw K.S. the Saturday before Meghan took K.S. to Tennessee. Rebecca testified that at one point she and Mike lived across the street from Meghan and Matthew. During that time, Rebecca saw K.S. every day, and she spent "a lot of alone time" with Meghan, who she considered to be a daughter. Specifically, Rebecca saw Meghan five or six times a week and often had "heart-to-hearts" with her.

¶ 15                            C. Meghan Siegel

¶ 16    Meghan testified that she filed a petition for temporary and permanent relocation of K.S. before she left for Tennessee on March 3, 2020. Meghan recognized that she had spent the majority of her marriage in Illinois, where she had purchased two homes with Matthew. Specific to March 3, 2020, Meghan acknowledged that she was a resident of Illinois, had filed a joint tax return in Illinois in 2019, and had an Illinois driver's license. Additionally, Meghan admitted that, prior to

4

leaving for Tennessee, she did not file a police report, request an order of protection, obtain a court order granting her primary care of K.S., and did not provide Matthew with a 60-day written notice of her intention to relocate. Despite this, Meghan claimed that she left on March 3, 2020, for "safety purposes and support." The following colloquy took place between defense counsel and Meghan:

> "Q. Do you believe that you can move without a court order?
> A. I did what I was advised to do.
> Q. Okay. And that's the same attorney you had last year [who advised you]; is that right?
> A. Correct.
> Q. Ms. Fiss?
>
> * * *
>
> Q. Why did you move without a court order?
> A. I was advised by my attorney that I could leave.
> MS. FISS [(PETITIONER'S ATTORNEY)]: No, no, no, no. You do not talk about what we talk about.
>
> * * *
>
> Q. And have you indicated any sort of notice to my client of the length of time that you're intending to relocate?
> A. No.
> Q. Okay. Are you sure exactly how long you want to relocate at this time?
> A. Yes.
> Q. And what is your answer?
> A. Permanently."

When asked about her work history, Meghan testified that she previously worked as a dental assistant but quit when she was pregnant with K.S. because Matthew constantly texted her throughout the day with accusatory messages. Meghan testified that she "absolutely loved" her job but Matthew "made it absolutely miserable" for her. Additionally, Meghan admitted that she never offered to meet Matthew halfway following the relocation and that Matthew could only visit K.S. at her parents' house in Tennessee.

¶ 17    On cross-examination, Meghan admitted that she had informed Matthew of her departure from Illinois after she arrived at her parents' home in Tennessee. When questioned about the June

2019 incident, Meghan testified that after Matthew became angry with her, he got on top of her and hit her in the face while K.S. was nearby in a bassinet. According to Meghan, Matthew's emotional abuse became more frequent after December 2019, which prompted her to quickly leave Illinois on March 3, 2020. On redirect examination, Meghan admitted the charges against Matthew for disorderly conduct in June 2019 had been dismissed.

¶ 18                                    D. Matthew Siegel

¶ 19    Matthew testified that, at the time of the hearing, he had not seen K.S. since March 3, 2020. Although Matthew had the option to visit K.S. in Tennessee, he testified that the five-hour, 297-mile commute was difficult with a full-time job. In addition, Matthew believed he would be putting himself at risk if he was forced to visit with K.S. in Meghan's parents' house. Matthew offered Meghan the marital home if she returned to Illinois with K.S. Matthew testified that his mother, Rebecca, was willing to retire to watch K.S. during the day while he worked. Matthew testified that, prior to March 3, 2020, he had a disagreement with Meghan regarding his desire to send K.S. to daycare two days a week. According to Matthew, Meghan had issues with this idea. Aside from the June 2019 incident, Matthew testified that Meghan never threatened to call the police, and the police were never involved in their marriage.

¶ 20    On cross-examination, Matthew denied that Meghan was fearful of him. In reference to the June 2019 incident, Matthew claimed that he "slapped her on the cheek." Matthew admitted, however, that he packed Meghan's clothing in bags and let her and K.S. go to Tennessee on the night of the incident. On redirect examination, Matthew testified that on one occasion he drove to Tennessee to see K.S. Because he was uncomfortable in Meghan's parents' home, Matthew requested Meghan to meet him at a McDonald's, but Meghan refused. Matthew admitted that he attended 26 consecutive weeks of partner intervention abuse classes following the June 2019

6

incident. With regard to daycare, Matthew wanted K.S. to attend daycare two days a week at The Goddard School in Edwardsville to learn social skills. Matthew indicated that daycare at this facility would be expensive but that he was willing to solely take on this expense because of his strong belief in the importance of education. Following testimony, the circuit court took the matter under advisement.

¶ 21 On April 24, 2020, the circuit court granted Matthew's petition for preliminary injunction, ordering Meghan to return K.S. to Illinois by May 13, 2020. The court, granting Meghan and K.S. exclusive possession of the marital residence, ordered Matthew to vacate the residence by May 8, 2020. Matthew was ordered to pay the mortgage, utilities, taxes, and insurance on the marital residence. The court denied Matthew's petition for primary residential parenting time but detailed a parenting schedule for both parties. Attorney Leslie Wood was appointed to serve as guardian *ad litem* (GAL).

¶ 22 On June 2, 2020, Matthew filed a motion for attorney fees and sanctions pursuant to Illinois Supreme Court Rule 137 (eff. Jan. 1, 2018). Specifically, Matthew argued that Meghan, whose decision to relocate was "nothing more than [her being] unhappy in her marriage," failed to properly provide written notice prior to her relocation. Matthew asserted that Meghan filed the petition for temporary and permanent relocation on the same day that she relocated to Tennessee. As a result of Meghan's relocation with K.S. without proper notice, Matthew requested attorney fees and Rule 137 sanctions because he was forced to hire an attorney to file a TRO and was subjected to a lengthy hearing in order to have K.S. returned to Illinois. That same day, the circuit court ordered Matthew to pay Meghan $1200 per month in temporary child support.

¶ 23 On July 22, 2020, the circuit court held a hearing on Meghan's April 14, 2020, petition for interim attorney fees and costs. The court awarded Meghan $14,000 in interim attorney fees and

7

costs.

¶ 24     On September 29, 2020, the GAL, after speaking with the parties and reviewing all documents, pleadings, and police reports, submitted a detailed, 18-page report and recommendation with the circuit court. The GAL recommended that the court deny Meghan's petition to relocate. In making this decision, the GAL believed the long commute would make it difficult for K.S. to have a "normal" childhood. The GAL also recommended that Meghan and Matthew share parental decision-making. In the event the parties were unable to share these responsibilities, it was recommended that Meghan decide healthcare and religious issues for K.S. and Matthew decide issues related to schooling and extracurricular activities, with a maximum of two activities at any given time, for K.S. Additionally, the GAL recommended that Meghan have the majority of the parenting time but advised that it was in K.S.'s best interest to see both of her parents frequently, thus, neither parent should go more than four nights without seeing K.S. The GAL further recommended that Matthew be awarded time with K.S. every other weekend from Friday night to Monday morning, every Tuesday overnight, and alternating Thursday overnight visits on the weeks Meghan had K.S. on the weekends.

¶ 25     On January 28, 2021, the circuit court held a nonjury trial. The following evidence was adduced at the trial.

¶ 26                              A. Matthew

¶ 27     Meghan's counsel first called Matthew to testify as an adverse party. Matthew, who was 36 years old at the time of the trial, testified that he was employed full-time by Agilis Systems where he earned a monthly gross income of $10,000 (Respondent's Exhibit 2). Matthew admitted, however, that he made approximately $1000 more a month at that time than what was contained in his September 2020 financial statement (Respondent's Exhibit 2) due to receiving a "one-time

managerial or director bonus that was applied towards 2020." Matthew received his college degree from Southern Illinois University-Edwardsville. As it related to the June 2019 incident, Matthew admitted that he pled guilty to disorderly conduct, although the charge was later dismissed. During their marriage, it was agreed that Meghan would stay at home during the first year of K.S.'s life. After that time, Matthew wanted K.S. to attend daycare two days a week. In the event he was granted custody, Matthew planned on enrolling K.S. in daycare at The Goddard School after K.S.'s first birthday. Due to the current visitation arrangement, Matthew had spent roughly four days a month (two days every other weekend and a couple of hours on Wednesday evenings) over the last nine months with K.S., although he had requested additional time with her.

¶ 28    On cross-examination, Matthew testified that he had recently requested time with K.S. on one of Meghan's weekends because his father's cancer had progressed, and he wished for K.S. to see her grandfather before he was admitted into the hospital. However, Meghan refused to accommodate Matthew's visitation request. Next, Matthew testified that Illinois offered a higher average hourly rate for dental assistants than Tennessee and that there were several open positions for dental assistants in Edwardsville (Respondent's Exhibit G). Prior to the COVID-19 pandemic, Matthew participated in a parent-child gymnastics program with K.S. Matthew also testified that he attempted to relocate to Tennessee. In particular, Matthew testified that he requested his past employer, One Source, on July 31, 2019, to work remotely in Tennessee, but his request was denied. Although Matthew applied to several positions in Tennessee, he was unable to obtain employment there. In his current position with Agilis Systems, Matthew was not allowed to work remotely. Matthew also testified that he was at work when he became aware that Meghan had relocated to Tennessee, filed for divorce, and charged $5000 to the couple's credit card to retain her current attorney. Matthew did not see K.S. from March 3, 2020, to May 2, 2020, and he was

not invited or allowed to see K.S. on her first birthday on April 7, 2020. Additionally, Matthew testified that he requested Meghan to meet halfway to exchange K.S., but Meghan declined. On redirect, Matthew testified that he applied to 17 jobs in Tennessee, 7 of which occurred after he was laid off at One Source.

¶ 29                                B. Meghan

¶ 30    Meghan's counsel called Meghan to testify on her own behalf. Meghan testified that she quit her job as a dental assistant when she was pregnant with K.S. Contrary to Matthew's testimony, Meghan testified that the couple never discussed sending K.S. to daycare. Instead, the parties agreed that Meghan would be a stay-at-home mom until K.S. attended kindergarten. According to Meghan, she loved dental assisting, but she quit her job because Matthew constantly texted her while she was at work. Meghan testified that Matthew constantly watched her, especially on the baby monitor while he was at work, closely monitored her spending, and isolated her from attending his family functions. Additionally, contrary to Matthew's testimony, Meghan testified that Matthew declined multiple offers to see K.S. in Tennessee and that Matthew ignored her FaceTime call on the night of K.S.'s first birthday.

¶ 31    Meghan testified that she left Illinois on March 3, 2020, because she and Matthew were arguing in front of K.S. Meghan testified that K.S.'s exposure to Matthew's controlling and abusive behaviors was detrimental to K.S.'s well-being. With regard to commuting between Tennessee and Illinois, she believed K.S. traveled well with no issues to date. Meghan testified that she had a job at a dental office in Bellevue, Tennessee, earning $25 an hour with full benefits. A comparable school to the Edwardsville School District was Nashville Christian, which was close to Meghan's dental office. Meghan testified that she would earn significantly less as a dental assistant in Illinois compared to Tennessee. Meghan admitted that she left for Tennessee the same

10

day she filed for relocation with the court; however, she claimed she left more than half of her clothes, a lot of K.S.'s clothing and accessories, and both her and K.S.'s birth certificates. Thus, she claimed she was not relocating but removing herself and K.S. from Matthew due to the constant arguments. Meghan explained that K.S. was extremely close with her family in Tennessee. In addition, in stating that she would earn significantly less in Illinois than Tennessee, Meghan testified that she was requesting that the court award her a marital share of Matthew's Charles Schwab retirement account.

¶ 32    On cross-examination, Meghan testified that her last place of employment was at a dental office in Wood River, Illinois, in September 2018. Meghan admitted that she had not contacted this employer to inquire about employment in the event she moved back to Illinois; however, she claimed she had submitted several applications in Illinois but had not heard back from any of them. Other than Matthew's child support, Meghan had no other source of income. Prior to Meghan leaving Illinois on March 3, 2020, she testified that Matthew's behaviors had escalated as early as October 2019. Meghan acknowledged that she would move to Illinois if court ordered.

¶ 33    Matthew's counsel called Matthew to testify on his own behalf. Matthew testified that he was currently living in Edwardsville in his sister's basement. Matthew was an uncle to six nieces and nephews in Edwardsville, including his sister's two children, a five-year-old boy and two-year-old girl, who played with K.S. when she visited. Matthew testified that if he was granted custody, he would live in Edwardsville. Matthew denied turning down an opportunity to FaceTime with K.S. when she was with Meghan. Instead, he testified that he did not believe it was in K.S.'s best interest to speak to her father on FaceTime because the internet connection was extremely poor where Meghan lived in Tennessee. In addition, Matthew testified that his base salary at that time was $125,000 and, depending on how the company performed, he can earn quarterly bonuses.

His most recent bonus was for an additional $10,000 on top of his base salary. Matthew testified that his last earnings statement showed an annual gross income of just over $130,000.

¶ 34 Following Matthew's testimony, Matthew's counsel discussed the maintenance estimator he used to compute maintenance for Meghan (Respondent's Exhibit P). Counsel "calculated 18 months from the date of marriage to the date that [Attorney] Ms. Fiss filed," which equaled "3.60 months of alimony." Moreover, counsel stated that "Rhonda agrees it's 3.60 [months], but we may disagree on the final number." Meghan's counsel agreed that the $1762.16 figure for maintenance was the suggested amount for maintenance based on Matthew's 2019 income, although both attorneys indicated the amount would be adjusted based on Matthew's income moving forward. Following this discussion, the circuit court adjourned for the day. The court stated on the record that the bench trial would continue the following day for 1½ hours with cross-examination and redirect of Matthew.

¶ 35 The next day, on January 29, 2021, Meghan filed a motion to continue the bench trial due to the circuit court imposing time limitations for questioning witnesses and the GAL. Meghan claimed that restricting time to cross-examine Matthew to 1½ hours was highly prejudicial to Meghan, as it did not provide enough time to adequately question a witness. Additionally, Meghan argued that the GAL's testimony should not be restricted due to the lengthy report. Additionally, counsel requested time to order a transcript of the January 28, 2021, hearing, before delivering closing arguments. Over Matthew's objection, the circuit court granted Meghan's motion, and the bench trial was continued to February 8, 2021. The court rescheduled the trial for February 8, 2021, allotting each party with 1 hour and 45 minutes to conclude their case. The court denied Meghan's counsel's request for additional time to order a trial transcript prior to closing arguments.

¶ 36 On February 8, 2021, Meghan filed a motion for Rule 137 sanctions against Matthew and

12

his attorney and a response to Matthew's June 2, 2020, motion for attorney fees and sanctions pursuant to Rule 137. The court did not hear argument on Meghan's motion.

¶ 37    On February 8, 2021, the circuit court resumed the bench trial via Zoom.

¶ 38                                A. Matthew

¶ 39    Meghan's counsel first called Matthew to testify as an adverse party. Matthew testified that he did not feel comfortable exercising visitation with K.S. in Meghan's parents' house. Matthew testified that before Meghan left with K.S. in March 2020, he and Meghan were fighting about her breastfeeding and smoking. Matthew testified that he filed an application in April 2020 at The Goddard School for K.S. to attend daycare in the event he was granted full custody. In addition, Matthew testified that asked for 50/50 custody with two days a week every other week on Tuesday and Wednesday and every other weekend. To accommodate time with K.S. on Tuesday and Wednesday, Matthew negotiated with his boss to work from home two days a week.

¶ 40    On cross-examination, Matthew testified that he asked to see K.S. on her first birthday, Father's Day, holidays, and several days leading up to the trial. However, according to Matthew, Meghan refused all of his requests unless he exercised visitation at her parents' house in Tennessee. Lastly, Matthew testified that he was requesting the court to make Illinois K.S.'s home state.

¶ 41                                B. Meghan

¶ 42    Meghan's counsel called Meghan to testify on her own behalf. Meghan testified to the following. Meghan testified that she was offered a full-time position as a dental assistant for an endodontist in Tennessee making $25 per hour with full benefits. Meghan would work Monday through Thursday from 7:30 a.m. to 4 p.m. and every Friday from 7:30 a.m. to 1 p.m. In comparison, Meghan testified that she would at most earn $15 per hour at a dental office in Illinois. In Tennessee, Meghan had ample family support to help with K.S. while she worked. In Illinois,

however, she had no support and had no knowledge of K.S. having a relationship with Matthew's parents.

¶ 43 On cross-examination, Meghan claimed that she told Matthew on March 3, 2020, that she left Illinois on a temporary basis. Although Meghan previously testified that she left Illinois because Matthew's aggression was escalating, she admitted that she did not file an order of protection and did not file for exclusive use of the marital home before leaving Illinois in March 2020.

¶ 44                                         C. Monica Gossett

¶ 45 Meghan's counsel called Monica Gossett to testify. Monica, who had been friends with Meghan for 10 years, testified that her younger daughter was dating Meghan's youngest brother. According to Monica, Meghan's entire family was wonderful. Additionally, Meghan was a fantastic mom, and K.S. was a happy child. Monica declined that her testimony was influenced by any financial considerations.

¶ 46                                         D. Leslie Wood

¶ 47 Matthew's counsel called Leslie Wood, K.S.'s GAL, to testify. Wood graduated from Southern Illinois University School of Law in 1997 and had served as a GAL in 247 prior cases. In forming her initial opinion, Wood met with Matthew, Meghan, and K.S. She also reviewed school report cards, read the transcripts of the April 22, 2020, hearing, and reviewed all exhibits and pictures that had been provided to her. Wood submitted a report to the circuit court on September 29, 2020, with a recommendation to deny relocation to Tennessee because she felt the parents needed to live near each other to give K.S. a full life. In addition, Wood did not believe it was in K.S.'s best interest to frequently drive in a car between Illinois and Tennessee. Moreover, based on a review of school report cards, Wood believed the Edwardsville School District, where

14

Matthew lived, was superior to Dickson County School District, where Meghan currently resided.

¶ 48    Wood also recommended Matthew and Meghan share decision-making. As alternative recommendation, if the parties were unable to mutually agree, Wood testified that she recommended Meghan to make healthcare and religious decisions, with Matthew making decisions for K.S. concerning schooling and extracurricular activities. Wood proposed Meghan have the majority of parenting time, and Matthew have parenting time with K.S. every other weekend from Friday to Monday, every Tuesday overnight, and alternating Thursdays. Wood testified that her final recommendation, which took into consideration the January 28, 2021, bench trial that she was present at, was the same as previously stated.

¶ 49    On cross-examination, Wood testified that she met with Meghan and Matthew one time on May 24, 2020, before rendering her recommendation. Wood acknowledged that she had concerns about Matthew's history of violence against Meghan; however, her concern was not strong enough to allow Meghan to relocate to Tennessee. Additionally, Wood admitted that traveling between states did not currently appear to have an effect on K.S.

¶ 50                             E. Matthew

¶ 51    Following closing arguments, Matthew's counsel called Matthew as a rebuttal witness. Matthew testified that following his marriage to Meghan on September 14, 2018, he worked for two companies where he contributed to retirement accounts and took contributions from each of those accounts to pay marital debt. He specified that both retirement accounts were cashed in as evidenced on their 2018 and 2019 tax returns. Matthew also testified that he had an "IRA that was a rollover account from a job [he] he had ten years ago from Charles Schwab," but that that he had not contributed to this account since he married Meghan. As it relates to his current employment with Agilis Systems, he was eligible to contribute to a 401(k) account in May 2020.

¶ 52    On cross-examination, Matthew testified that "the physical copies [of the Charles Schwab rollover account] are being sent because they are longer than three years old." Meghan's counsel asked Matthew where the documentation was because there was no exhibit. Matthew's counsel objected stating, "He can testify under oath as to what he *** transfer[red]. It's not necessary to have a paper transaction on everything." In response, Meghan's counsel stated that Matthew had the burden of proof to the exact amount that he was claiming to be nonmarital. The court stated that Matthew had provided testimony that the transactions had been listed on the financial affidavits with the 2018 and 2019 tax returns. Following testimony, the circuit court took the matter under advisement.

¶ 53    On February 16, 2021, Meghan filed a motion to amend with an amended motion for sanctions pursuant to Rule 137. Shortly thereafter, Matthew objected to Meghan's motions. The circuit court held a hearing on all outstanding motions for sanctions, objections to motions for sanctions and objections thereto on February 22, 2021. The court denied both Meghan and Matthew's motions for Rule 137 sanctions; however, the court granted Matthew's June 2, 2020, motion for attorney fees against Meghan. Meghan was ordered to pay Matthew's prior counsel $7533.33 for work associated with the hearing on Matthew's TRO following Meghan's relocation to Tennessee on March 3, 2020.

¶ 54    On June 7, 2021, after entering a judgment of dissolution of marriage, the circuit court ordered the following: (1) the parties to file an individual or agreed judgment of allocation of parental responsibilities within 30 days; (2) Meghan was granted decision-making responsibilities for healthcare and religion and Matthew was granted decision-making responsibilities as to school and extracurricular activities for K.S.; (3) the parties to sell the marital residence in Edwardsville, Illinois, and equally split proceeds and liabilities; (4) the parties to use proceeds from the sale of

16

the marital residence to pay two outstanding marital credit card debts; (5) the parties to draft a proposed temporary child support order within 30 days allocating parenting time awarded in the judgment of allocation of parental responsibilities and parenting plan; (6) Matthew to provide health, dental, and vision insurance for K.S.; (7) Matthew to pay K.S.'s daycare expenses as long as Matthew was employed and for Meghan to pay 40% of monthly daycare expenses once Meghan started to work; (8) detailing the child tax credits for both parties; (9) Matthew to pay maintenance of $1762.16 for 3.6 months or $5286.48; (10) each party to retain their respective vehicle to individually satisfy any outstanding indebtedness; (11) Matthew to retain sole ownership of his retirement and 401(k) plan; (12) the parties to file a married filing jointly income tax return for 2020 and evenly divide all profits and/or liabilities resulting therefrom; (13) each party to pay their own attorney fees and costs, except as previously court ordered on February 22, 2021, in which Meghan was ordered to pay $7533.33 for Matthew's attorney fees; (14) the parties to exchange any personal property of the other party within 30 days; and (15) Meghan to file documentation of unemployment benefits within 14 days of the date of judgment.

¶ 55    Additionally, in a separate order filed on June 7, 2021, the circuit court made several additional rulings. First, the court denied Meghan's petition for temporary and permanent relocation. In making this ruling, the court relied on the GAL's report and recommendation that relocation would negatively impact K.S.'s ability to have a normal childhood due to a burdensome five-hour commute each way between Tennessee and Illinois. Although the court acknowledged Meghan's available job opportunity in Tennessee, the court believed relocation would impose ongoing expenses that would make it challenging for Meghan to facilitate Matthew's parenting time. The court determined that Matthew's concerns were legitimate with regard to the effect the burdensome distance would have on K.S. and the difficulty in maintaining quality parenting time

17

with her.

¶ 56    Next, the circuit court denied Meghan's motion for Rule 137 sanctions. The court granted in part and denied in part Matthew's June 2, 2020, motion for attorney fees and Rule 137 sanctions. The court denied the imposition of sanctions against Meghan; however, the court granted the attorney fees of $7533.33 against Meghan in favor of Matthew. In making this determination, the court stated that there existed "no indication in the sworn testimony and evidence" that Meghan's circumstances were such that she would have been required to leave Illinois on March 3, 2020, without notice to the court and Matthew. In particular, Meghan did not provide any evidence related to new allegations of domestic abuse prior to relocating and she did not file a statement or a police report alleging new domestic violence against her or that she feared for her and K.S.'s safety. Additionally, there was no evidence or witness testimony to support a finding that Meghan was a victim of domestic violence at the time she left Illinois in March 2020.

¶ 57    Meghan filed timely notices of appeal from both of the circuit court's June 7, 2021, orders. On July 12, 2021, Meghan filed an emergency enforcement of judgment, which this court denied on July 21, 2021.

¶ 58                                          II. Analysis

¶ 59    On appeal, Meghan argues that the circuit court's June 7, 2021, order was against the manifest weight of the evidence in (1) denying Meghan's petition for temporary and permanent relocation, (2) awarding Matthew sole discretion on issues of schooling and extracurricular activities, (3) inequitably dividing marital property, (4) inequitably dividing marital debt, and (5) erroneously awarding Meghan an inadequate maintenance award. In addition, Meghan asserts that the court abused its discretion in (1) sanctioning Meghan for temporarily leaving Illinois with K.S. in March 2020 and (2) ordering Meghan to pay 40% of daycare costs upon employment.

18

¶ 60                    A. Violations of Illinois Supreme Court Rule 341

¶ 61    At the outset, we address Meghan's failure to comply with Illinois Supreme Court Rule 341 (eff. Oct. 1, 2020), which governs the content of appellate briefs. In violation of Rule 341(a), Meghan failed to provide this court with a brief that contained double-spaced text. Ill. S. Ct. R. 341(a) (eff. Oct. 1, 2020). In addition, Rule 341(h)(6) requires that the statement of facts "contain the facts necessary to an understanding of the case, stated accurately and fairly without argument or comment." Ill. S. Ct. R. 341(h)(6) (eff. Oct. 1, 2020). Here, Meghan's statement of facts is argumentative and overly emotional. Notably, the rules of procedure governing appellate briefs are rules rather than suggestions. *Rosestone Investments, LLC v. Garner*, 2013 IL App (1st) 123422, ¶ 18. In other words, failure to comply with supreme court rules is not an inconsequential matter, and we may strike a brief that fails to substantially conform to the pertinent rules. *Hall v. Naper Gold Hospitality LLC*, 2012 IL App (2d) 111151, ¶ 9. Although a review of Meghan's statement of facts reveals that it does not comport with Rule 341(h)(6), we will not strike the statement the facts where the violations do not hinder our review. See *McMackin v. Weberpal Roofing, Inc.*, 2011 IL App (2d) 100461, ¶ 3. This court, however, admonishes counsel to carefully adhere to the requirements of the supreme court rules in future appeals.

¶ 62                              B. Relocation Order

¶ 63    Pursuant to section 609.2(f) of the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) (750 ILCS 5/609.2(f) (West 2018)), the parent wishing to relocate in a contested relocation case must file a petition seeking court approval and bears the burden of proving that the relocation is in the best interests of the child, as measured by the factors set forth in section 609.2(g). See *In re Marriage of Levites*, 2021 IL App (2d) 200552, ¶ 57; see also *In re Marriage*

19

*of Collingbourne*, 204 Ill. 2d 498, 521 (2003) (court emphasized that the consideration of the best interests of the child is the " 'paramount question' " in removal actions).

¶ 64    The statutory factors outlined in section 609.2(g) of the Marriage Act are as follows:

"(1) the circumstances and reasons for the intended relocation;

(2) the reasons, if any, why a parent is objecting to the intended relocation;

(3) the history and quality of each parent's relationship with the child and specifically whether a parent has substantially failed or refused to exercise the parental responsibilities allocated to him or her under the parenting plan or allocation judgment;

(4) the educational opportunities for the child at the existing location and at the proposed new location;

(5) the presence or absence of extended family at the existing location and at the proposed new location;

(6) the anticipated impact of the relocation on the child;

(7) whether the court will be able to fashion a reasonable allocation of parental responsibilities between all parents if the relocation occurs;

(8) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to relocation;

(9) possible arrangements for the exercise of parental responsibilities appropriate to the parents' resources and circumstances and the developmental level of the child;

(10) minimization of the impairment to a parent-child relationship caused by a parent's relocation; and

(11) any other relevant factors bearing on the child's best interests." 750 ILCS 5/609.2(g) (West 2018).

20

Courts are mindful, however, that consideration of a child's best interest " 'cannot be reduced to a simple bright-line test' and that a ruling on the best interests of a child 'must be made on a case-by-case basis, depending, to a great extent, upon the circumstances of each case.' " *In re Marriage of Fatkin*, 2019 IL 123602, ¶ 32 (quoting *In re Marriage of Eckert*, 119 Ill. 2d 316, 326 (1988)). Thus, citation to and reliance on "other relocation cases are of limited value for purposes of comparison because the result in each case depends on the unique facts and circumstances of the case." *Levites*, 2021 IL App (2d) 200552, ¶ 71 (citing *In re Marriage of Berk*, 215 Ill. App. 3d 459, 465-66 (1991)).

¶ 65     In cases of this nature, a reviewing court does not reweigh the competing considerations but reviews the circuit court's decision deferentially with a strong and compelling presumption in favor of the circuit court's result. *Fatkin*, 2019 IL 123602, ¶ 32. Such deference is appropriate because the circuit court, as the trier of fact, had " ' "significant opportunity to observe both parents and the child, and, thus, is able to assess and evaluate their temperaments, personalities, and capabilities." ' " *Id.* (quoting *Eckert*, 119 Ill. 2d at 330, quoting *Gallagher v. Gallagher*, 60 Ill. App. 3d 26, 31 (1978)). Accordingly, a circuit court's determination as to the best interests of a child should not be reversed unless it is against the manifest weight of the evidence. *Id.* A court's decision is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent or where the "factual findings on which the decision depends are clearly, plainly, and indisputably erroneous." *In re Parentage of P.D.*, 2017 IL App (2d) 170355, ¶ 18 (citing *Wakeland v. City of Urbana*, 333 Ill. App. 3d 1131, 1139 (2002)).

¶ 66     The circuit court here was faced with a contested relocation petition, and it conducted several days of trial where both parties were given a full and fair opportunity to present evidence and testimony. Following the hearing, the court entered its order providing its factual findings. We

21

note, however, that the court's order does not specifically and clearly identify each statutory factor in section 609.2(g) of the Marriage Act and its application to the facts of this case. On appeal, Meghan argues that the court failed to address factor nine (*i.e.*, possible alternative schedules and/or transportation) and factor three (*i.e.*, Matthew's failed or forfeited parenting time with K.S.), and also overall failed to "conduct[ ] it's [*sic*] own separate, detailed analysis of the evidence." We disagree.

¶ 67    Although a circuit court must consider all relevant factors when determining the best interests of a child for relocation purposes, it is not required to make a finding or reference to each factor, "as long as evidence was presented from which the court could consider the factors prior to making its decision." *In re Marriage of Hefer*, 282 Ill. App. 3d 73, 79 (1996). Despite a lack of specific mention of the factors by the court, generally, we presume that a circuit court knows the law and follows it accordingly. *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 43 (citing *In re Alexander R.*, 377 Ill. App. 3d 553, 556 (2007)).

¶ 68    The first factor in section 609.2(g) concerns the circumstances and reasons for the intended relocation. 750 ILCS 5/609.2(g)(1) (West 2018). Here, the circuit court determined that Meghan wished to move to Tennessee because she desired to be closer to her family, had a better paying job there, and the schools, in her opinion, were comparable or better in Tennessee than in Edwardsville. The court, however, agreed with the recommendation of the GAL that Meghan's motives for moving to Tennessee did not justify relocation. Specifically, K.S.'s quality of life would be disrupted with frequent, five-hour car rides between Tennessee and Illinois. Additionally, the court believed relocation would impose ongoing expenses that would make it challenging for Meghan to facilitate Matthew's parenting time. This factor weighed in favor of Matthew.

¶ 69    The second factor in section 609.2(g) concerns Matthew's reasons for objecting to the intended relocation. *Id.* § 609.2(g)(2). The circuit court noted that Matthew's concerns were legitimate as it related to "the burdensome frequent drives, their effect on the minor child and the difficulty maintaining quality parenting time." Again, the court noted that the ongoing costs Meghan would acquire to facilitate K.S.'s parenting time with Matthew would be difficult to manage given her financial constraints. This factor weighed in favor of Matthew.

¶ 70    The third factor in section 609.2(g) concerns the history and quality of each parent's relationship with the child and whether a parent has substantially failed or refused to exercise the parental responsibilities allocated to him or her under the parenting plan or allocation judgment. *Id.* § 609.2(g)(3). Although the court did not explicitly detail the relationship of each party with K.S., the circuit court determined, with reliance on the GAL's lengthy, 18-page report, that the relocation would negatively impact K.S. because, essentially, K.S. would be "left with one parent if the parties live five hours apart." Although the court noted that the parties "have difficult[y] co-parenting," the court determined that it was important for K.S. to consistently have access to both of her parents. In addition, the GAL's report noted that neither party had failed or refused to exercise parental responsibility. Although Meghan testified that Matthew failed and/or refused to come to Tennessee to spend time with K.S., Matthew testified in response that his only available option was to visit with K.S. at Meghan's parents' house where he did not feel particularly comfortable given the nature of his relationship with Meghan. This factor was neutral for the parties.

¶ 71    Factor four concerns educational opportunities for the child at the existing location and at the proposed new location. *Id.* § 609.2(g)(4). The GAL's report concluded that the Edwardsville School District would offer better educational opportunities for K.S. than in Dickson County,

Tennessee, where Meghan currently lived. The GAL's report detailed the use of a website called Niche that compared the school report cards of the two school districts. This factor weighed in favor of Matthew.

¶ 72    Factor five concerns the presence or absence of extended family at the existing location and at the proposed new location. *Id.* § 609.2(g)(5). With respect to this factor, the evidence demonstrated that Meghan had family in Tennessee and no family in Illinois, whereas Matthew had family in Illinois and no family in Tennessee. The court, relying on the GAL's report, stated that it was unclear how much effort Meghan had made to establish relationships in Illinois. This factor was neutral for the parties.

¶ 73    Factor six concerns the anticipated impact of the relocation on the child. *Id.* § 609.2(g)(6). The court clearly stated that the "relocation will negatively impact the minor child." In making this determination, the court noted the burdensome traveling K.S. would be forced to endure and the fact that K.S. would be regularly parented by one parent given the significant distance between the parties. In addition, the court noted that, although Meghan had a job waiting for her in Tennessee, the commuting would be a significant ongoing cost if relocation was granted. This factor weighed in favor of Matthew.

¶ 74    Factor seven concerns whether the circuit court will be able to fashion a reasonable allocation of parental responsibilities between all parents if relocation occurs. *Id.* § 609.2(g)(7). Although not specifically mentioned in the court's order, again, the court indicated that the significant distance and five-hour commute would leave K.S. with one parent and impose financial constraints on Meghan to facilitate parenting time with Matthew. In addition, the GAL's report referenced that relocation would ultimately "ruin the child's ability to have a 'normal' childhood"

24

with making friends and engaging in activities once K.S. was in school. This factor weighed in favor of Matthew.

¶ 75    Factor eight concerns the wishes of the child, considering the child's maturity and ability to express reasoned and independent preferences as to relocation. *Id.* § 609.2(g)(8). Provided K.S. was unable to express her wishes at just two years old at the time of the disposition, this factor was neutral for the parties.

¶ 76    Factor nine concerns possible arrangements for the exercise of parental responsibilities and the developmental level of the child. *Id.* § 609.2(g)(9). On appeal, Meghan argues that "[t]here is no reason that Matthew, with his substantial financial resources, couldn't fly down to Nashville at least one weekend per month." The GAL's report, however, made specific reference to Meghan's financial constraints that posed a barrier to facilitating parenting time with Matthew and allowing for quality parenting time with K.S. Again, the significant distance between the parties was mentioned to be a burden on the young child. Thus, the GAL and court could not determine a possible arrangement where the above concerns did not exist if K.S. relocated to Tennessee. This factor weighed in favor of Matthew.

¶ 77    Factor 10 concerns minimizing the impairment to the parent-child relationship caused by a parent's relocation. *Id.* § 609.2(g)(10). As stated earlier, the circuit court was concerned that relocation would negatively impact K.S. because she would be "left with one parent if the parties live five hours apart." Presuming that a circuit court knows the law and follows it accordingly (*G.L.*, 2017 IL App (1st) 163171, ¶ 43 (citing *Alexander R.*, 377 Ill. App. 3d at 556)), the court relied on the GAL's determination that "[t]he only way to minimize this [impairment] is to recommend against relocation." This factor weighed in favor of Matthew.

¶ 78     The last factor, factor 11, concerns any other relevant factors bearing on the child's best interests. *Id.* § 609.2(g)(11). The circuit court's order provided that the parties had difficulty coparenting, Matthew was controlling, and Meghan felt intimidated and fearful of Matthew, which was fueling her desire to relocate to Tennessee. In addition, the court indicated that Meghan was unemployed, and her support system was in Tennessee; however, the court believed ongoing expenses would prove challenging for Meghan to facilitate parenting time. In conclusion, the court determined relocation would cause a disruption to K.S.'s time with her parents and burden her with frequent travel time by car. Given the circuit court has the best opportunity to observe the parties and assess their personality and capabilities (*Fatkin*, 2019 IL 123602, ¶ 32 (quoting *Eckert*, 119 Ill. 2d at 330)), we cannot conclude that the court's determination was against the manifest weight of the evidence. The court's findings were relevant to the best interests of the child, considering the unique circumstances of this case, and indicate a deliberate assessment of the personalities and capabilities of the parties by the trier of fact.

¶ 79          C. Allocation of Parental Decision-Making Responsibilities

¶ 80     Again, we find it important to note that Meghan's brief fails to comply with Rule 341(h)(7), which requires that the appellant's arguments contain her contentions and the reasons thereof, with citations to authorities and to the pages of the record relied upon in support of the appellant's contentions. The appellate court "is entitled to have issues clearly defined with pertinent authority cited and cohesive arguments presented," and this court is "not a repository into which an appellant may foist the burden of argument and research." (Internal quotation marks omitted.) *Velocity Investments, LLC v. Alston*, 397 Ill. App. 3d 296, 297 (2010) (quoting *Stenstrom Petroleum Services Group, Inc. v. Mesch*, 375 Ill. App. 3d 1077, 1098 (2007), quoting *Obert v. Saville*, 253 Ill. App. 3d 677, 682 (1993)). Specifically, Meghan has failed to provide citations to the record

26

and has provided no authority to argue that the court's order regarding the allocation of parental decision-making responsibilities was against the manifest weight of the evidence. 750 ILCS 5/602.5(c) (West 2016). Because "mere contentions, without argument or citation of authority, do not merit consideration on appeal," this argument is forfeited. *Palm v. 2800 Lake Shore Drive Condominium Ass'n*, 401 Ill. App. 3d 868, 881 (2010); see also *Hall*, 2012 IL App (2d) 111151, ¶ 12.

¶ 81                         D. Attorney Fees for Relocation to Tennessee

¶ 82    The circuit court ordered Meghan to pay, per section 609.2(d), Matthew's attorney fees and costs "for failing to comply with the Relocation Notice requirement without good cause." As Meghan correctly states, she was required to provide at least 60 days' notice of her intention to relocate, prior to relocation, unless said notice was impractical. 750 ILCS 5/609.2(d) (West 2018). On appeal, Meghan argues that the circuit court abused its discretion in sanctioning her for temporarily taking K.S. from Illinois the same day she filed for dissolution from Matthew. We disagree.

¶ 83    Section 609.2(c) and (d) of the Marriage Act states the following:

     "(c) A parent intending a relocation, as that term is defined in paragraph (1), (2), or (3) of subsection (g) of Section 600 of this Act, must provide written notice of the relocation to the other parent under the parenting plan or allocation judgment. A copy of the notice required under this Section shall be filed with the clerk of the circuit court. ***

     (d) The notice must provide at least 60 days' written notice before the relocation unless notice is impracticable (in which case written notice shall be given at the earliest date practicable) or unless otherwise ordered by the court. ***

27

The court may consider a parent's failure to comply with the notice requirements of this Section without good cause (i) as a factor in determining whether the parent's relocation is in good faith; and (ii) as a basis for awarding reasonable attorney's fees and costs resulting from the parent's failure to comply with these provisions." *Id.* § 609.2(c), (d).

A circuit court has broad discretionary powers in awarding attorney fees and its discretion will not be reversed on review unless the court abused its discretion. *In re Estate of Callahan*, 144 Ill. 2d 32, 43-44 (1991) (citing *In re Estate of Healy*, 137 Ill. App. 3d 406, 411 (1985)). An abuse of discretion exists where the circuit court's decision is arbitrary or fanciful, or where no reasonable person would agree with the court's position. *Pate v. Wiseman*, 2019 IL App (1st) 190449, ¶ 28.

¶ 84    On appeal, Meghan maintains that she did not relocate to Tennessee but temporarily left Illinois, thus, the relocation statute does not apply. We disagree. Section 600(g)(3) of the Marriage Act defines "relocation" as "a change of residence from the child's current primary residence to a residence outside the borders of this State that is more than 25 miles from the current primary residence, as measured by an Internet mapping service." 750 ILCS 5/600(g)(3) (West 2020). The record supports a finding that K.S. lived in Tennessee with Meghan from March 3, 2020, until on or around May 13, 2020. Meghan did not return K.S. to Illinois on her volition but was court ordered to do so on or by May 13, 2020.

¶ 85    Additionally, to support leaving Illinois on March 3, 2020, Meghan claims she left for "safety purposes and support." Similar to the circuit court's reasoning, this court fails to see the emergency situation Meghan claims existed on March 3, 2020. In particular, Meghan claims on appeal that she had one of two options that day, to either travel to Tennessee to her parents' home or find refuge at a women's shelter. What Meghan fails to address in her argument is the fact that

there is no proof, such as the filing of an order of protection or a police report, to necessitate a relocation due to an impractical situation. Instead, the record demonstrates that Meghan, aware of the requirements to file notice under the relocation statute, left Illinois with K.S. five hours before Matthew knew his wife and daughter were out of state. As a result of her actions, Matthew hired an attorney to file a TRO and was subjected to a lengthy hearing to have K.S. returned to Illinois. Based on the record, this court cannot conclude that the circuit court's finding was arbitrary or fanciful. Accordingly, we conclude that the court did not abuse its discretion in ordering Meghan to pay Matthew's attorney fees of $7533.33 for prior litigation.

¶ 86                                    E. Division of Property

¶ 87    Next, Meghan argues that the circuit court's order was inequitable and against the manifest weight of the evidence in awarding Matthew all proceeds in the Charles Schwab IRA account. Specifically, she contends that Matthew failed to meet his burden in proving that the IRA Charles Schwab account was nonmarital. We disagree.

¶ 88    The Marriage Act defines marital property as all property acquired by either spouse subsequent to the marriage. 750 ILCS 5/503(a) (West 2018). The Marriage Act, however, lists exceptions, including "property acquired before the marriage, except as it relates to retirement plans that may have marital *and* non-marital characteristics." (Emphasis added.) *Id.* § 503(a)(6). Moreover, under section 503(b)(2) of the Marriage Act, "all pension benefits (including *** defined benefits plans, defined contribution plans and accounts, *individual retirement accounts*, and non-qualified plans) acquired by or participated in by either spouse after the marriage and before a judgment of dissolution of marriage *** are presumed to be marital property." (Emphasis added.) *Id.* § 503(b)(2). It is the burden of the party who claims the property is nonmarital to rebut the presumption with clear and convincing evidence. *In re Marriage of Stuhr*, 2016 IL App (1st)

152370, ¶ 51. Any doubts as to the classification of the property will be resolved in favor of finding that the property is marital property. *Id.*

¶ 89    We first note that the circuit court's June 7, 2021, order did not specifically mention the Charles Schwab IRA account. The court's order, however, ordered that "each party retain sole ownership of their respective retirement, pension benefits, pensions, or retirement plans." Thus, we can infer that the court, having heard testimony regarding the existence of the Charles Schwab account, included the IRA account as a retirement account in its judgment of dissolution of marriage. At the February 8, 2021, hearing, Matthew testified that he had an "IRA that was a rollover account from a job [he] had ten years ago from Charles Schwab." Matthew also testified that, since he married Meghan, he had not contributed to this account. In addition, Matthew filed three financial affidavits, one on May 8, 2020, demonstrating a Charles Schwab IRA account with an account balance of $65,000; another on September 17, 2020, demonstrating a Charles Schwab IRA account with an account balance of $84,000; and the last one on January 21, 2021, demonstrating a Charles Schwab IRA account with an account balance of $84,000. Meghan did not refute Matthew's testimony other than to testify that she desired to have a marital share because she would earn significantly less income living in Illinois than in Tennessee. Based on Matthew's testimony and documentation of the account balance in the Charles Schwab IRA account, we cannot conclude that the court erred in awarding Matthew sole ownership of a premarital retirement account.

¶ 90                                   F. Division of Debt

¶ 91    Here, again, we find it important to note that Meghan's brief fails to comply with Rule 341(h)(7), which requires that the appellant's arguments contain his or her contentions and the reasons thereof, with citations to authorities and to the pages of the record relied upon in support

the appellant's contentions. Again, the appellate court "is entitled to have issues clearly defined with pertinent authority cited and cohesive arguments presented," and this court is "not a repository into which an appellant may foist the burden of argument and research." (Internal quotation marks omitted.) *Velocity Investments, LLC*, 397 Ill. App. 3d at 297 (quoting *Stenstrom Petroleum Services Group, Inc.*, 375 Ill. App. 3d at 1098, quoting *Obert*, 253 Ill. App. 3d at 682). Specifically, Meghan, without citations to the record or citation and reliance on any authority, argues that the court's decision was inequitable because Meghan "so desperately needs [the money] as a recently divorced stay-at-home mother," but Matthew could afford to pay the credit card bills. Because "mere contentions, without argument or citation of authority, do not merit consideration on appeal," this argument is forfeited. *Palm*, 401 Ill. App. 3d at 881; see also *Hall*, 2012 IL App (2d) 111151, ¶ 12.

¶ 92                              G. Spousal Maintenance

¶ 93    Meghan argues that the circuit court's order was against the manifest weight of the evidence where it inadequately awarded Meghan maintenance of $1762.16 for 3.6 months or a total of $5286.48. Generally, a circuit court's award of maintenance is presumed to be correct. *In re Marriage of Nord*, 402 Ill. App. 3d 288, 292 (2010). A circuit court is allowed "broad discretion to determine the propriety, amount, and duration of maintenance, and its judgment will not be reversed absent an abuse of discretion." *In re Marriage of Dowd*, 2013 IL App (3d) 120140, ¶ 21 (citing *In re Marriage of Rogers*, 352 Ill. App. 3d 896, 899 (2004)). An abuse of discretion exists where the circuit court's decision is arbitrary or fanciful, or where no reasonable person would agree with the court's position. *Pate*, 2019 IL App (1st) 190449, ¶ 28.

¶ 94    Section 504(a) of the Marriage Act provides that, in a proceeding for dissolution of marriage, a circuit court "may grant a maintenance award for either spouse in amounts and for

31

periods of time as the court deems just." 750 ILCS 5/504(a) (West 2020). Section 504(a) lists several factors that a court must consider, where relevant, when determining a maintenance award:

"(1) the income and property of each party, including marital property apportioned and non-marital property assigned to the party seeking maintenance as well as all financial obligations imposed on the parties as a result of the dissolution of marriage;

(2) the needs of each party;

(3) the realistic present and future earning capacity of each party;

(4) any impairment of the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having foregone or delayed education, training, employment or career opportunities due to the marriage;

(5) any impairment of the realistic present or future earning capacity of the party against whom maintenance is sought;

(6) the time necessary to enable the party seeking maintenance to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself through appropriate employment;

(6.1) the effect of any parental responsibility arrangements and its effect on a party's ability to seek or maintain employment;

(7) the standard of living established during the marriage;

(8) the duration of the marriage;

(9) the age, health, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and the needs of each of the parties;

(10) all sources of public and private income, including, without limitation, disability and retirement income;

(11)   the tax consequences to each party;

(12) contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse;

(13) any valid agreement of the parties; and

(14) any other factor that the court expressly finds to be just and equitable." *Id.*

¶ 95    Circuit courts have wide latitude in considering which factors should be used in determining reasonable needs, and the court is not limited to the factors listed in the statute. *In re Marriage of Brill*, 2017 IL App (2d) 160604, ¶ 28 (citing *In re Marriage of Brankin*, 2012 IL App (2d) 110203, ¶ 10). No single factor is determinative of the propriety of a maintenance award once it has been determined that an award is appropriate. *Id.* (citing *Brankin*, 2012 IL App (2d) 110203, ¶ 10).

¶ 96    Meghan contends that the circuit court miscalculated Meghan's maintenance award. When, as here, a party challenges a court's factual findings regarding maintenance, we will not reverse those findings unless they were against the manifest weight of the evidence. *Nord*, 402 Ill. App. 3d at 294 (citing *In re Marriage of Walker*, 386 Ill. App. 3d 1034, 1041 (2008)). Findings are "against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the court's findings are unreasonable, arbitrary, and not based on any of the evidence." *In re Marriage of Bhati*, 397 Ill. App. 3d 53, 61 (2009) (citing *In re Marriage of Matchen*, 372 Ill. App. 3d 937, 946 (2007)).

¶ 97    In this case, while the circuit court's order detailed all of the factors continued in section 504(a) of the Marriage Act, it appears that the court was heavily influenced by two factors: the short duration of the marriage and that Meghan had training and experience to become gainfully employed. While section 504 requires a court to consider all relevant factors, there is no

requirement that the factors be given equal weight, so long as the balance struck by the court is reasonable under the circumstances. *Dowd*, 2013 IL App (3d) 120140, ¶ 22 (citing *In re Marriage of Reynard*, 378 Ill. App. 3d 997, 1004 (2008)). After considering the factors, the court awarded maintenance under section 504(b-1)(1)(A) of the Marriage Act, which sets guideline maintenance providing that "[t]he amount of [guideline] maintenance *** shall be calculated by taking 33 1/3% of the payor's net annual income minus 25% of the payee's net annual income." 750 ILCS 5/504(b-1)(1)(A) (West 2020). The record supports the court's finding that Matthew's 2019 net income was $89,369 with a prospective net income for Meghan of $24,336. The court likely considered Meghan's ability to work $15 an hour for 40 hours a week as a dental assistant in Illinois. The record indicates that Matthew's counsel admitted Respondent's Exhibit P, which detailed the maintenance estimator for Matthew's 2019 net income. Additionally, a review of the guidelines set forth in section 504(b-1)(1)(B) of the Marriage Act (*id.* § 504(b-1)(1)(B) (duration of award shall be calculated by multiplying (.20) by the number of months when marriage was five years or less)) indicates that the court was correct in awarding Meghan 3.6 months (18 months x .20) of maintenance.

¶ 98　　A review of Matthew's 2020 earnings statement indicates that Matthew earned $3866.62 net income biweekly or $7733.24 net income monthly, which would equal $92,798.88 annually, not including an additional $17,038.36 earned in bonuses and commissions. Although this court finds that the circuit court did not abuse its discretion in awarding Meghan maintenance on a temporary basis for 3.6 months, we remand for a new maintenance determination taking into consideration Matthew's 2020 income that was provided to the circuit court. As such, the issue of spousal maintenance is reversed and remanded for further proceedings to take into consideration Matthew's most recent income in computing Meghan's maintenance.

¶ 99                                    H. Daycare Expenses

¶ 100   Lastly, Meghan argues that the circuit court abused its discretion in ordering her to pay 40% of K.S.'s daycare expenses upon employment, given Meghan does not currently have a job and the cost of the daycare was unknown. We agree. Although the record indicates that Meghan will likely be able to find work as a dental assistant in Illinois, it was unknown to the court where she would work, how much she would earn per hour, and how many hours she would be guaranteed to work each week. In addition, because Matthew has parental decision-making over schooling, he will likely choose to enroll K.S. in The Goddard School, which he indicated was expensive in his testimony on April 22, 2020. Although we agree with the court's determination to deny relocation, we find it was an abuse of discretion to speculate that Meghan would be able to afford such an amount for daycare, given the court order requiring her to move back to Illinois where she will incur additional expenses, such as housing, that she would not be subject to in Tennessee. The portion of the court's order requiring Meghan to pay 40% of daycare expenses is reversed and remanded for further determination.

¶ 101                                    III. Conclusion

¶ 102   For the reasons stated above, we affirm the circuit court's June 7, 2021, judgments where the court denied Meghan's petition for temporary and permanent relocation, ordered Meghan to pay Matthew's attorney fees of $7533.33 for prior litigation, allocated decision-making responsibilities for schooling and extracurricular activities to Matthew, ordered Matthew and Meghan to use proceeds from the sale of the marital residence to pay two outstanding marital credit card debts, and awarded Matthew sole ownership of his retirement IRA account. We, however, reverse the portions of the court's order pertaining to spousal maintenance and daycare expenses and remand for further hearing on those issues.

¶ 103   Affirmed in part and reversed in part; cause remanded.